UNITED STATES of America, Appellee,

v.

Norman Lyle PROUSE, Appellant.

UNITED STATES of America, Appellee,

v.

Robert John KIRCHNER, Appellant.

UNITED STATES of America, Appellee,

v.

Joseph Wesley BALZER, Appellant.

Nos. 90–5585 to 90–5587.

United States Court of Appeals,
Eighth Circuit.

Submitted June 10, 1991.

Decided Sept. 20, 1991.

Rehearing and Rehearing En Banc
Denied Oct. 31, 1991.

Peter B. Wold, Minneapolis, Minn., for appellant Prouse.

Douglas Olson, Minneapolis, Minn., for appellant Kirchner.

Bruce H. Hanley, Minneapolis, Minn., for appellant Balzer.

William J. Mauzy, Minneapolis, Minn., on brief, for appellants.

Elizabeth de la Vega, Asst. U.S. Atty., Minneapolis, Minn., for appellee, Jerome G. Arnold, Minneapolis, Minn. and Kathryn Eilers, Legal Intern., on brief.

Before ARNOLD and MAGILL, Circuit Judges, and BATTEY,* District Judge.

MAGILL, Circuit Judge.

Norman Lyle Prouse, Robert John Kirchner, and John Wesley Balzer appeal their conviction upon a jury verdict and sentence for operating a commercial passenger airplane while under the influence of alcohol in violation of 18 U.S.C. § 342 (1988). Appellants raise numerous claims. The most substantial is that the district court[1] improperly denied their motion to suppress blood test evidence because it was obtained in violation of their fourth amendment rights. We reject all of appellants' claims and affirm both their convictions and their sentences.

I.

On March 7, 1990, at approximately 11:00 a.m., Northwest Airlines (NWA) Flight 650 landed in Fargo, North Dakota. The flight crew consisted of Prouse as captain, Kirchner as first officer, and Balzer as second officer. The three men checked into the Days' Inn Motel in nearby Moorhead, Minnesota. At approximately 4:00 p.m., appellants Prouse, Kirchner, and Balzer went to the Speakeasy Restaurant and Lounge (Speakeasy) located approximately one and one-half blocks from their motel.

John Stenerson, Les Stenerson, and Bill Fellows, three local residents, arrived at the Speakeasy at approximately 8:30 p.m. They noticed that the conversation at appellants' table was getting loud. Approximately one hour later, the Stenerson party began to talk with appellants. After finding out that appellants were NWA pilots, the Stenerson party asked, at least twice, "You guys aren't flying out at 6:00 a.m. tomorrow, are you?" Appellants lied and said, "No." When Kirchner and Balzer left at 10:30 p.m., they had shared approximately six and one-half pitchers of beer and were noticeably unsteady. Prouse continued to drink with the Stenerson party. During that time, Prouse admitted that he, Kirchner, and Balzer were scheduled to fly out of Fargo at 6:00 a.m. the next morning. When Prouse finally decided to leave at around 11:30 p.m., he had consumed approximately seventeen rum and diet cokes. As he stood up to leave, both he and his chair fell over backward. Prouse got up shakily, refusing help, and made an unsteady exit. About twenty minutes later, Prouse returned to the Speakeasy and asked for directions to the Days' Inn. The waitress informed him that it was a block and a half away, straight down the road.

Les Stenerson subsequently made an anonymous call to the Federal Aviation Administration (FAA) expressing his concern about appellants' ability to fly a plane early the next morning. Stenerson told the FAA that he had witnessed three NWA pilots drinking heavily late into the night at the Speakeasy in Moorhead, Minnesota, and that by the time they left, the pilots appeared quite intoxicated. Stenerson also

---

* The Honorable Richard H. Battey, United States District Judge for the District of South Dakota, sitting by designation.

1. The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

identified one of the pilots as "Lyle Pseudo." At 1:30 a.m., the FAA Flight Standards District Office's answering service called FAA Inspector Verle Addison and informed him of the anonymous call. FAA officials subsequently directed Addison to meet with the flight crew before their 6:00 a.m. departure.

Following Addison's arrival at the airport at approximately 5:00 a.m., NWA personnel told him that the 6:00 a.m. flight crew normally arrived at approximately 5:15 a.m. Kirchner and Prouse arrived at approximately 5:45 a.m. They had waited close to ten minutes for Balzer at the motel, but when he did not show up, they decided to continue on without him. Addison noticed an odor of stale alcohol when Kirchner and Prouse spoke to him. He also noticed that Prouse's eyes were quite red. Addison told Prouse and Kirchner of the anonymous phone call and that he smelled alcohol on them. Kirchner said that they had had dinner at the Speakeasy the night before, but he did not mention drinking. Addison informed Prouse and Kirchner that he would continue his investigation. Shortly after 6:15 a.m., Balzer arrived. Addison informed him of the anonymous call and stated that he noticed an odor of stale alcohol emanating from Balzer. Balzer responded that he had not been drinking the night before and that he had returned to his motel room early and read a book. Balzer also stated that he was late because he was up most of the night with a bad case of diarrhea. Balzer then boarded the aircraft.

Addison called Doug Solseth, an FAA aviation safety inspector in Minneapolis, to discuss the situation. Shortly thereafter, the plane took off. Addison was surprised at the quick departure because he knew that Balzer was required to perform a thorough preflight inspection before take-off and that Balzer could not have performed such an inspection in the short time between their conversation and the take-off. Officials later learned that Kirchner had performed the inspection, even though he was not qualified or authorized to do so.

When Prouse, Kirchner and Balzer deplaned in Minneapolis, they were met by various NWA employees and FAA officials. From a distance of thirty to thirty-five feet, Solseth noticed that they had flushed faces and bloodshot eyes. NWA employees then took appellants to the NWA Service Manager's Office to avoid creating a public spectacle. Meanwhile, Solseth consulted with Minneapolis Airport Police Officer David Kuhns and requested that Kuhns perform a blood test on appellants. Soon afterwards, Kuhns spoke with appellants, noticing an odor of stale alcohol on each appellant's breath. At the time, Kuhns believed that appellants had violated a Minnesota statute that prohibited operating an aircraft while under the influence of alcohol. *See* Minn.Stat. Ann. § 360.075, subd. 1(2), (3) (repealed 1990) (flying while under the influence of alcohol is now addressed at Minn.Stat. § 360.0752). Kuhns, however, also believed that he did not have the authority to arrest appellants because this offense was only a misdemeanor and it was not committed in his presence. *See State v. Duren*, 266 Minn. 335, 123 N.W.2d 624, 632 (1963). Consequently, Kuhns advised that one of the individuals present at the landing and deplaning should conduct a citizen's arrest. During a subsequent interview with appellants, Solseth informed them that he was performing a citizen's arrest for their violation of an FAA regulation prohibiting the operation of an aircraft within eight hours of consuming alcohol or while under the influence of alcohol. *See* 14 C.F.R. § 91.11(a)(1), (2) (1987). At the time of their arrests, Solseth read appellants an Implied Consent Advisory[2] requesting that they submit to a blood alcohol test. Appellants agreed to submit to a blood test.

At 9:15 a.m., personnel at the Hennepin County Medical Clinic administered blood tests. The Minnesota Bureau of Criminal Apprehension Laboratory analyzed these tests. The results showed that Prouse had

---

2. Kuhns modified an Implied Consent Advisory form that was used for motor vehicle DUI violations, substituting "aircraft" for "motor vehicle" and "fly" for "drive."

a 0.13 blood alcohol concentration (B.A.C.), Kirchner had a 0.06 B.A.C., and Balzer had a 0.08 B.A.C. Following the initial blood tests, NWA security took appellants to the Airport Medical Clinic for a second blood test. These tests took place at 11:15 a.m. Medtox Laboratory, a private lab not affiliated with the United States Government, analyzed these samples. The results of these tests showed that Prouse had a 0.104 B.A.C., Kirchner had a 0.036 B.A.C., and Balzer had a 0.054 B.A.C.

Appellants were ultimately indicted for operating a common carrier while under the influence of alcohol, in violation of 18 U.S.C. § 342 (1988). The jury trial began on July 25, 1990. At trial, the government called various witnesses who had observed appellants on March 7 and 8 to testify about appellants' conditions and actions. The government also called an expert witness who testified that he could estimate the B.A.C.s of appellants when the plane took off by using the B.A.C. data from the two blood tests. He calculated that at 6:30 a.m., appellants' B.A.C.s were as follows: Prouse's B.A.C. would have been in the range of 0.15–0.21, with a likely B.A.C. of 0.18; Kirchner's B.A.C. would have been in the range of 0.08–0.14, with a likely B.A.C. of 0.11; and Balzer's B.A.C. would have been in the range of 0.10–0.16, with a likely B.A.C. of 0.13. This expert also testified that, at 9:15 a.m., Prouse had the equivalent of approximately eight mixed drinks in his body and that Balzer and Kirchner each had the equivalent of two and one-half to three bottles of beer in his body. The government also presented expert testimony that, even at the low end of the B.A.C. range, all of appellants could be considered "under the influence" when they flew from Fargo to Minneapolis.

Appellants called witnesses who testified that they did not notice anything to indicate alcohol impairment on the morning of the flight. Prouse called several expert witnesses who challenged the use of B.A.C. as an absolute indicator of being "under the influence." They testified that individuals responded differently to alcohol, and that Prouse, who admitted to being an alcoholic, would have a greater alcohol tolerance than an average person. Therefore, Prouse could have a much higher B.A.C. and still not be "under the influence." Kirchner and Balzer each called a forensic chemist as a witness, but the district court refused to recognize these witnesses as experts on low-level alcohol impairment.

On August 20, 1990, the jury convicted all three appellants of operating a common carrier while under the influence of alcohol. On October 26, 1990, the district court sentenced Kirchner and Balzer to twelve months' imprisonment, and Prouse to sixteen months' imprisonment. Appellants also received a three-year term of supervised release. As a condition of probation, the district court ordered that appellants could not fly or operate an aircraft during the first year of supervised release and were precluded from piloting an aircraft with passengers for the entire three-year term.

## II.

Appellants raise a host of issues on appeal. Their chief claim is that the district court erred in denying their motions to suppress the results of the blood tests. They also argue that there was insufficient evidence presented to the jury to sustain their conviction; that they were adversely affected by the improper statements of the prosecutor during closing argument; that the district court erred in denying Kirchner's motion for severance; that the district court erred when it limited some of the defense's expert witness testimony; that the district court erred when it denied a jury instruction requested by Kirchner; and that the district court erred when it imposed a sentence of supervised release which precluded piloting an aircraft for one year.

### A. Motion to Suppress the Results of the Blood Tests

■ Appellants claim that the district court improperly denied their motion to suppress the results of the blood tests. They argue that the first blood tests were the fruit of an unlawful arrest; that there

was not probable cause to support the first blood tests; and that the results of the second blood tests were privileged. We review each argument in turn, keeping in mind that a district court's denial of a motion to suppress is reviewed under a clearly erroneous standard. *United States v. Williams*, 917 F.2d 1088, 1090 (8th Cir. 1990); *United States v. Boucher*, 909 F.2d 1170, 1173 (8th Cir.1990).

▮ As to the first blood tests, appellants initially argue that the court must suppress the results because the tests were the fruit of an illegal arrest. We reject this argument. Solseth did have the authority to arrest appellants. Minnesota law provides that a private person may arrest another private person when "a felony has in fact been committed, and the arresting person has reasonable cause for believing the person arrested to have committed it." Minn.Stat.Ann. § 629.37(3) (West Supp.1990). The Minnesota Supreme Court has held that "reasonable cause" is synonymous with "probable cause." *State v. Merrill*, 274 N.W.2d 99, 108 (Minn.1978). Therefore, the question becomes whether Solseth had probable cause to believe that appellants had committed a felony at the time he arrested them.[3]

The Supreme Court has described probable cause as a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). In *Gates*, the Court held that a detailed anonymous tip that was corroborated provided the police with sufficient probable cause to obtain a search warrant. The Court considered the tipster's veracity and basis of knowledge in light of the totality of the circumstances. *Id.* at 230, 103 S.Ct. at 2328. At the time of the arrests, Solseth knew of an anonymous tip disclosing the following: that three NWA pilots had been drinking excessively at the Speakeasy; that the pilots left the Speak-

easy intoxicated; that the pilots were scheduled to fly a 6:00 a.m. NWA flight out of Fargo on the following morning; that one of the pilots was named "Lyle Pseudo"; and that the tipster had been drinking with the pilots. If Solseth had had only this tip to go on, it is questionable if he would have had probable cause. By the time appellants were arrested, however, many aspects of the tip had been corroborated. First, several people had smelled stale alcohol on all three appellants. Second, several people, including Solseth, had noticed appellants' bloodshot eyes and flushed faces. Third, appellants arrived late to the airport. Fourth, there were three NWA pilots who had been in the Speakeasy the night before. Fifth, these three pilots were scheduled to fly out of Fargo at 6:00 a.m. Sixth, one of the pilots was named Norman Lyle Prouse, similar to the "Lyle Pseudo" mentioned by the tipster. Finally, the pilots had left the Fargo airport abruptly without informing the FAA official who they knew was conducting an investigation into the anonymous tip. Therefore, when the pilots stepped off of Flight 650 in Minneapolis with bloodshot eyes and smelling of stale alcohol, Solseth clearly had probable cause to believe that the pilots had flown the aircraft while under the influence of alcohol.

▮ The fact that Solseth was unaware of the federal statute that made it a felony to operate a commercial passenger airplane while under the influence of alcohol is irrelevant. This court has stated that:

> Where a defendant is arrested for the wrong offense, the arrest is still valid if probable cause existed to arrest the defendant for a closely related offense. It is immaterial that at the time of the entry and arrest the officers did not have in mind the specific charge upon which the arrest can be justified; the offenses need only be closely related, and probable cause to arrest the defendant on the appropriate charge must have been present at the time.

---

**3.** Appellants argue that they were arrested shortly after they deplaned, even though Solseth did not expressly arrest appellants until approximately an hour later. We will assume without deciding that appellants were arrested shortly after they deplaned.

*United States v. Rambo,* 789 F.2d 1289, 1294 (8th Cir.1986) (citations omitted). In this case, both the FAA regulation, on which Solseth relied, and the federal criminal statute prohibited flying an airplane while under the influence of alcohol. Thus, violation of the FAA regulation is closely related to the federal criminal offense. Also, as previously noted, there was probable cause to arrest appellants for violating the federal criminal statute. Accordingly, the fact that Solseth thought he was arresting appellants for violating an FAA regulation, the violation of which does not constitute a criminal offense, and was unaware of the federal criminal statute does not invalidate the arrests. Because the arrests did not violate the fourth amendment, the subsequent blood tests cannot be the "fruit" of an unlawful arrest.

■ Appellants also argue that the court should suppress the results of the first blood tests because the police did not have probable cause to conduct the tests. This argument is without merit. The same facts that established probable cause for the arrests also established probable cause for the blood tests. Additionally, given that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, a warrantless blood test was an appropriate incident to appellants' arrests. *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966). Accordingly, appellants' first blood tests fully satisfied the requirements of the fourth amendment.

■ Finally, appellants argue that the court should suppress the results of the first blood tests because the police's failure to comply with Minnesota and federal regulations governing the administration of blood alcohol tests rendered the appellants' consent to the tests invalid. Even assuming that the police failed to comply with procedural regulations, thereby rendering the appellants' consent invalid, this fact is irrelevant. Consent to a search is an exception to the probable cause and warrant requirements. *Schneckloth v. Busta-monte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). When

those requirements are satisfied or independently excepted, lack of consent in no way creates a constitutional violation. Consequently, appellants' arguments that the court should suppress the results of the first blood tests are without merit.

■ Appellants also seek suppression of the results of the second blood tests administered at the Airport Medical Clinic. They argue that the results of these blood tests are privileged under both state and federal law. Minnesota law provides that "[p]ositive test results from an employer drug or alcohol testing program may not be used as evidence in a criminal action against the employee or job applicant tested." Minn. Stat.Ann. § 181.954, subd. 4 (West Supp. 1991). Appellants attempt to use this statutory privilege as a barrier preventing the government's use of the test results from the NWA-initiated blood tests. The Federal Rules of Evidence, however, instruct courts to apply privileges in light of reason and experience. Fed.R.Evid. 501. We are not bound to use this privilege and, because we do not believe it was intended to provide protection in these circumstances, we reject appellants' state privilege argument.

Appellants also argue that federal law protects the results of the second blood tests. We find appellants' attempt to twist the language of unrelated statutes to provide shelter from the consequences of their actions to be completely without merit. Consequently, we reject appellants' claims of privilege.

In summary, because the district court's decision to deny appellants' motion to suppress the results of the first and second blood tests would survive de novo review, there is no question that the district court's decision was not clearly erroneous.

**B. Sufficiency of the Evidence**

■ Appellants claim that the government introduced insufficient evidence to support the jury's verdict. In reviewing sufficiency claims, we must affirm convictions if there is substantial evidence to support the jury's verdict, viewing the evidence in the light most favorable to the

government. *United States v. Meirovitz,* 918 F.2d 1376, 1380 (8th Cir.1990) (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). Appellants argue that there was no direct evidence of impairment and, therefore, the guilty verdict must be reversed. We disagree. The jury heard evidence that appellants drank a tremendous amount of alcohol the evening before their flight; that appellants were intoxicated when they left the Speakeasy; that they arrived late to work the next morning with bloodshot eyes and smelling of stale alcohol; that they left without checking with Addison, the FAA official they knew was investigating whether they had violated an FAA regulation regarding the consumption of alcohol; and that two hours and forty-five minutes after they flew the plane, the captain had the equivalent of eight mixed drinks in his system and the first and second officers had the equivalent of two and one-half to three beers in their systems. Based on this evidence, the case was not even close. Consequently, we reject appellants' sufficiency of the evidence claim.

### C. All Other Claims

■■■■ Appellants present several other claims, none of which are meritorious. First, Balzer claims that the prosecutor made improper statements during closing argument which prejudiced him.[4] Balzer failed to object to these statements at the time they were made, so we must review them under the plain error standard. Under this standard, the verdict is upheld unless the statements were such as "to undermine the fairness of the trial and contribute to a miscarriage of justice." *United States v. Young,* 470 U.S. 1, 20, 105 S.Ct. 1038, 1049, 84 L.Ed.2d 1 (1985). There was plenty of evidence that Balzer did not look very good on the morning of March 8. Including the van driver in the group of people who thought that Balzer looked "terrible" may have been a mistake, but it certainly did not create any great

injustice. Furthermore, while no evidence was presented regarding the oxygen depletion on the plane, Balzer's attorney did mention the depletion in his opening argument. Finally, the statement that Balzer forgot his hat in the van was insignificant at best. Given the context of the entire trial, these statements do not rise to the level of plain error. Consequently, we deny Balzer's request for a new trial.

■■■■ Second, Kirchner claims that the district court erred in denying his motion for severance. Kirchner argues that being tried with Prouse unfairly prejudiced him because the evidence of Prouse's intoxication was so strong that a spillover effect was unavoidable. Kirchner also argues that he was prejudiced by Prouse's tolerance argument. We review district court severance rulings under an abuse of discretion standard. *United States v. O'Meara,* 895 F.2d 1216, 1219 (8th Cir.1990). The issues in this case were not complex. There was no evidence that the jury was unable to compartmentalize the evidence. Kirchner's and Prouse's defenses were so distinct that it is unlikely the jury would have confused the two. Furthermore, the jury was repeatedly told to give appellants separate consideration. Consequently, we find that the district court did not abuse its discretion when it refused to grant Kirchner's request for severance.

■■■■ Third, Kirchner and Balzer claim that the district court erred when it limited the testimony of two of their expert witnesses. We review district court decisions on the admissibility of evidence under an abuse of discretion standard. *United States v. Foote,* 898 F.2d 659, 665–66 (8th Cir.1990). The first expert's testimony that appellants claim the district court improperly limited was that of Thomas Burr, a chemist who had limited experience with studying the effects of alcohol on humans. The district court limited Burr's testimony when Kirchner asked him to comment on the effects of alcohol on "information pro-

---

**4.** The statements in question are: "The witnesses said, the van driver said he looked terrible in the van.... [H]e [Balzer] forgets his hat in the van.... Remember, this was a 45–minute flight. Why was the oxygen completely depleted after the end of a 45–minute flight?" Tr., Vol. XII, at 39.

**1026**

cessing skills." Because Burr's background is in chemistry and his experience was limited to simple sobriety tests, the district court properly held that he was not qualified to comment on a subject as complex as "information processing."[5] Appellants also challenge the district court's limitation of Patrick Demers' testimony. Balzer attempted to ask Demers, "Have you seen individuals at 0.10 that were not impaired?" Based on the foundation laid for Demers' expert status, this question was outside of his area of expertise. The district court's decision to prohibit this question thus was not an abuse of discretion. Consequently, we reject all of appellants' claims regarding their expert witnesses.

 Fourth, Kirchner claims that the district court improperly refused to give one of his requested jury instructions. Kirchner's requested instruction stated:

> A person who is found to have a blood alcohol concentration of .10 percent or more at the time he operated an aircraft shall be presumed to be under the influence of alcohol. There is no presumption that a person is under the influence if you find that the person operated an aircraft with a blood alcohol concentration below .10 percent.

Kirchner's Add. at 5. A defendant is entitled to a "theory of defense" instruction only if it contains a correct statement of the law and it is supported by the evidence. *United States v. Meyer*, 808 F.2d 1304, 1306–07 (8th Cir.1987). Kirchner's requested instruction is based on 18 U.S.C. § 343(1) (1988), which provides that "an individual with a blood alcohol content of .10 percent or more shall be presumed to be under the influence of alcohol...." A statutory basis for an instruction, however, does not entitle the defendant to a particularly worded instruction. *See Meyer*, 808 F.2d at 1307. Moreover, Kirchner's instruction attempted to turn the mandatory presumption into a minimum level for a determination of "under the influence," potentially misleading the jury. Therefore,

we reject Kirchner's argument that the district court erred in refusing to give his requested instruction.

 Finally, all three appellants argue that the district court improperly imposed a sentence that included supervised release, and precluded them from piloting an aircraft for one year and from piloting an aircraft with passengers for three years. Appellants argue that the district court exceeded its authority by restricting appellants' ability to fly because the power to regulate aviation resides exclusively in the FAA. We disagree. The district court is not attempting to usurp the FAA's authority in any way. It merely fashioned a penalty that was reasonably related to the nature and circumstance of the offense and that would protect the public. *See* 18 U.S.C. § 3583 (1988); U.S.S.G. § 5D1.3. Appellants' abuse of the privilege granted them by the FAA resulted in a great risk to many lives. It is thus completely appropriate that their term of supervised release include a restriction on their exercise of this federally granted privilege.

### III.

For the foregoing reasons, appellants' convictions and sentences are affirmed.

---

**5.** Appellants also claim that the district court should not have allowed the government to cross-examine Burr on studies produced by the National Transportation Safety Board and by the FAA Civil Medical Institute. We disagree.

The questions asked by the government on cross-examination were a valid attempt to impeach statements made by Burr in his direct testimony.