# UNITED STATES COURT OF APPEALS
## Tenth Circuit
### Byron White United States Courthouse
### 1823 Stout Street
### Denver, Colorado 80294
### (303) 844-3157

Patrick J. Fisher, Jr.                                         Elisabeth A. Shumaker
Clerk                                                         Chief Deputy Clerk

December 4, 1997


**TO:**  All recipients of the captioned opinion

**RE:**  96-3021, *Sprague v. Thorn Americas*
November 24, 1997


Please be advised of the following correction to the captioned decision:

Due to a typographical error, name of counsel for the appellant is misspelled.  M. Kathryn Webb is the correct spelling.

Please make the appropriate correction.

Very truly yours,

Patrick Fisher, Clerk


Keith Nelson
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 24 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

SHELLEY A. SPRAGUE,

      Plaintiff-Appellant,

v.

THORN AMERICAS, INC. and ED
KOWALSKI,

      Defendants-Appellees.

No. 96-3021

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## (D.C. No. 93-CV-1478)

---

M. Kathryn Webb of McDonald, Tinker, Skaer, Quinn & Herrington, Wichita,
Kansas, for Plaintiff-Appellant.

Timothy B. Mustaine (Mary Kathleen Babcock with him on the brief), of Foulston
& Siefkin, Wichita, Kansas, for Defendants-Appellees.

---

Before **BRORBY, HOLLOWAY** and **EBEL,** Circuit Judges.

---

**HOLLOWAY,** Circuit Judge.

---

Plaintiff-appellant Shelley Sprague brought the present action against defendants, alleging gender discrimination and sexual harassment in violation of Title VII and the Kansas Acts Against Discrimination, K.S.A. § 44-1001, et seq, constructive and retaliatory discharge, breach of contract,[1] and violation of the Equal Pay Act. The United States District Court for the District of Kansas entered summary judgment against Sprague on each of her claims and this appeal followed, asserting error in the summary judgment ruling. Sprague also claims error in the district court's denial of her motion to compel. We have jurisdiction by virtue of 28 U.S.C. § 1291, and we affirm.

## I. Background

Viewing the evidence in the light most favorable to the non-moving party, as we must when reviewing a grant of summary judgment, Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996), the essential facts are as follows:

Plaintiff-appellant, Shelley Sprague, began working for defendant-appellee, Thorn Americas, Inc., as a secretary in September 1989.[2] I Aplt. App. at 58 (statement of uncontroverted facts). While attending orientation Sprague was given an employee handbook, which she signed on September 7, 1989. By signing the

---

[1]Sprague does not appeal the district court's rejection of her implied contract claim and we will therefore not review this issue.

[2]At the time Sprague was known as Shelley Rose. Additionally, Thorn did business as Rent-A-Center.

handbook, Sprague acknowledged that her employment with Thorn was an "at will" relationship, which permitted either Sprague or Thorn to terminate her employment at any time, with or without cause. Id.; see also II Aplt. App. at 398-399, 407 (district court's Memorandum and Order granting summary judgment).

During the events forming the basis of this lawsuit, Sprague's title with Thorn was "Market Analyst." Aple. Supp. App. at 92. Until June 1992, Sprague's duties involved the entire range of Thorn's products and her supervisor was J. D. Henning. In June 1992, Sprague took on additional responsibilities as Market Analyst in the jewelry department and she was reassigned to defendant-appellee Ed Kowalski. Specifically, she conducted meetings for a jewelry task force charged with "[u]pdating the product, putting in a new assortment." I Aplt. App. at 116-17. She also recorded the minutes of these meetings. Id. at 116. These tasks were ones that were performed by Assistant Product Managers (APMs) for other departments. Id. at 139. However, some of the tasks that Sprague performed differed from those of the APMs because the APMs had more marketing experience and hence were given more discretion. Id.

Sprague last reported for work on September 24, 1993, and was terminated on November 1, 1993. Id. at 82. She continued to draw her full salary, however, until October 28. See Appellant's Reply Brief, Attachment A at 4 (letter from Douglas B. Westerhaus to M. Kathryn Webb). Between September 24 and November 1, Sprague

4

indicated that she would be willing to return to work if Kowalski were not her supervisor. Aple. Supp. App. at 85-86. She also sought to have her job description upgraded and to receive back pay back to mid-1992, when she began to perform tasks similar to those performed by the APMs, both of whom were male. Id. at 49, 52, 82. Thorn refused to keep Sprague in her position with a different supervisor and on November 1 deemed her to have abandoned her job and terminated her.

Sprague filed her original complaint in the district court on December 1, 1993. On the next day, she filed charges of discrimination with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission (EEOC), and she amended the charges on April 15, 1994. I Aplt. App. at 3. The EEOC issued a "Notice of Right to Sue" on May 23, 1994. Id. On November 8, 1994, Sprague filed her first amended complaint. Sprague raised several separate claims in her lawsuit. She contends that she should have been promoted to the position of an Assistant Product Manager and paid a salary commensurate with such position. Since both of Thorn's APM positions were occupied by males, she alleges that Thorn's failure to promote her and pay her at a rate equal to that of the male APMs constituted gender discrimination in violation of both the Equal Pay Act and Title VII. Sprague also brought a claim alleging hostile work environment sexual harassment, which is based on five incidents involving Mr. Kowalski, detailed later in Part III-C. Finally, Sprague asserts that she was subjected to constructive and retaliatory discharge.

5

The district court held that there were no genuine issues of material fact and that defendants were entitled to summary judgment. Memorandum and Order, II Aplt. App. at 396. Sprague v. Thorn Americas, No. 93-1478, 1995 WL 767308 (D. Kan. Dec. 18, 1995). The judge concluded that Sprague failed to present an actionable claim under the Equal Pay Act; the evidence revealed that Thorn did not have an assistant manager position in its jewelry department because that department constituted a relatively minor part of Thorn's business. The judge further stated that Sprague's job functions were not substantially similar to those of the two males who acted as assistant managers of other departments and that Sprague merely performed some, but not all, of the functions of an assistant manager. With respect to Sprague's allegations of sexual harassment and hostile working environment, the judge stated the standard of liability to be that: "An employer may be liable for sexual discrimination when it permits the existence of an atmosphere so severe or pervasive in its offensiveness or hostility to reasonable workers that it alters the conditions of the employees' work environment. Harris v. Forklift Systems, 126 L.Ed.2d 295 (1993); Meritor Savings Bank v. Vinson, 477 U.S. 57, 65 (1986)." Memorandum and Order at 8-9. The judge identified the occurrences complained of and held that they did not establish a sexually hostile working environment. Id. The judge also held that Sprague failed to show that she was constructively discharged

6

since Sprague offered no evidence that a reasonable person would have viewed the working conditions as intolerable.

With respect to Sprague's claim of retaliatory discharge, the district judge concluded that Sprague failed to demonstrate any action by Thorn which reflected wrongful adverse job action, other than terminating her after not returning to work for several months. The district court stressed that Sprague conceded that she was an "at will" employee and that the parties did not enter into any implied employment contract.

## II. Standard of Review

We review *de novo* the district court's grant of summary judgment, applying the same standard used by the district court. Bohn v. Park City Group, Inc., 94 F.3d 1457, 1460 (10th Cir. 1996). "Summary judgment is appropriate if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Williams v. Widnall, 79 F.3d 1003, 1005 (10th Cir. 1996) (quoting Fed. R. Civ. P. 56(c)). When applying this standard, we must "examine the factual record and reasonable inferences therefrom in the light most favorable to the non-moving/opposing party." Kidd v. Taos Ski Valley, Inc., 88 F.3d 848, 851 (10th Cir. 1996). If there is no dispute concerning a genuine issue of material fact, we then determine whether the district court correctly applied the

substantive law. <u>Peck v. Horrocks Engineers, Inc.</u>, 106 F.3d 949, 951 (10th Cir. 1997).

### III. Analysis

We first examine whether the district court erred in granting summary judgment in favor of defendants on Sprague's claims of gender discrimination under Title VII, 42 U.S.C. § 2000e-2(a), and the Equal Pay Act (EPA), 29 U.S.C. § 206(d)(1).[3] At the outset we note that with respect to her Title VII claim of gender discrimination, Sprague argues on appeal that defendants' motion for summary judgment did not specifically address this claim and that defendants produced no specific evidence to refute the claim. Sprague thus contends that the district court erred in granting summary judgment since defendants failed to meet their burden of showing that they were entitled to judgment on the claim of gender discrimination. Our independent review of the record also reveals that the district court did not precisely address Sprague's Title VII gender discrimination claim in the context of her employment privileges, denial of promotion, and rate of pay, although the district court did specifically address Sprague's EPA claim.

---

[3]We are mindful that the elements and burdens of proof differ under the Equal Pay Act and Title VII. <u>See</u> <u>Tidwell v. Fort Howard Corp.</u>, 989 F.2d 406, 409-10 (10th Cir. 1993); <u>Meeks v. Computer Assoc. International</u>, 15 F.3d 1013, 1020 (11th Cir. 1994). We therefore address these claims separately in our discussion.

We are not persuaded by Sprague's procedural objection to the defendants' presentation of their position on the Title VII claim of gender discrimination. It appears from the record that defendants' motion for summary judgment did, in fact, address the issue of gender discrimination under Title VII, both in its discussion regarding sexual harassment as well as equal pay. I Aplt. App. at 52-89. Indeed, the issue of Sprague's gender and the discrimination and mistreatment she allegedly suffered as a result thereof, forms the basis of Sprague's entire action. Throughout their motion for summary judgment, defendants clearly and specifically contested Sprague's assertions that she was deprived certain privileges of employment due to her gender.

Although we recognize that the Equal Pay Act and Title VII provide distinct causes of action and do not require precisely the same standard of proof, we are satisfied that defendants' arguments contained in their motion for summary judgment adequately addressed both Sprague's Title VII gender discrimination claim as well as her Equal Pay Act claim. We do not consider it fatal to defendants' motion for full summary judgment that defendants did not specifically include a separate argument or heading on Title VII "gender discrimination," when their argument against that gender discrimination claim by Sprague below was essentially raised and incorporated within defendants' discussion of the alleged violations of the Equal Pay Act in defendants' brief below. See I Aplt. App. at 31-35. Moreover, it appears from

9

the record that Sprague did not raise any objection below that defendants failed to precisely challenge the Title VII gender discrimination claim in her response to defendants' motion for summary judgment.

In sum, we conclude that the issue regarding gender discrimination under Title VII was adequately presented to the district court and we further find that, in its order granting summary judgment, the district court necessarily concluded by implication that defendants' alleged failure to formally promote Sprague to assistant manager or pay her the salary commensurate with such a position did not violate Title VII.

## A. Title VII Gender Discrimination Claim

Turning specifically to Sprague's Title VII gender discrimination claim, Sprague stated in her amended complaint that she was "discharged, discriminated against and treated differently by defendant [Thorn] with respect to compensation, terms, conditions and privileges of her employment due to her sex, female, in violation of 42 U.S.C. § 2000e-2(a)(1) and (2)." I Aplt. App. at 7. Sprague essentially contends that males who performed the duties of assistant managers were given the title and salary commensurate with such a position, while Sprague was denied a promotion to such title and salary because of her gender, even though she performed the same functions.

10

"In a Title VII case, the initial burden is on the employee to make a *prima facie* showing of discrimination by the employer." Nulf v. International Paper Co., 656 F.2d 553, 557 (10th Cir. 1981) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, (1973)). "Only when such a showing has been made does the burden shift to the employer to articulate 'some legitimate, nondiscriminatory reason' for the questioned action. If the employer meets this burden, the employee must show that the stated reason is actually a pretext for prohibited discrimination." Id. at 558 (quoting McDonnell Douglas, 411 U.S. at 804).

We have recognized that the "elements of a prima facie case set forth in McDonnell Douglas have been applied to promotion cases." Nulf, 656 F.2d at 558 (citations omitted). In order to establish a *prima facie* claim of discriminatory failure to promote under Title VII, Sprague was required to "show that there were promotional opportunities available that were filled by males, that she was qualified for promotion, and that despite her qualifications she was not promoted." Id. And Sprague bears the ultimate burden of establishing that Thorn intentionally discriminated against her. Tidwell v. Fort Howard Corp., 989 F.2d 406, 409 (10th Cir. 1993); see also Meeks v. Computer Associates International, 15 F.3d 1013, 1019 (11th Cir.1994) (the McDonnel Douglas framework requires a Title VII plaintiff to establish an intent to discriminate on the part of her employer).

11

We are not persuaded that Sprague established a *prima facie* case of failure to promote because of gender. As the record reveals, and the district court concluded, Thorn "did not have an Assistant Manager position in its Jewelry Department, because that department formed such a small part of the company's business." See district court's Memorandum and Order at 10. It is indeed difficult for us to understand how Sprague can maintain that she was the victim of discrimination due to Thorn's refusal to promote her to the position of assistant manager of jewelry when such a position did not even exist. We therefore find it highly questionable whether promotional opportunities were even available with respect to Sprague's position. More importantly, Sprague failed to produce any evidence which shows that if such opportunities did, in fact, exist, Thorn intentionally gave such positions to males because of a gender preference. Further, there is no indication that Thorn purposely refused to create such a position in an effort to discriminate against women or deny Sprague promotional opportunities. We therefore conclude that Sprague failed to make a *prima facie* showing of intentional gender discrimination with respect to Thorn's refusal to promote her.

With respect to Sprague's Title VII equal pay claim, we earlier stated that "the equal pay/equal work concept applies to Title VII in the same way it applies to" the EPA. Nulf, 656 F.2d at 560. However, the Supreme Court in County of Washington v. Gunther, 452 U.S. 161, 168-171, 180-81 (1981), determined that the EPA's

requirement that a plaintiff prove equal work does not apply to Title VII. Rather, "a cause of action for discriminatory compensation based on sex could arise under Title VII even if a plaintiff did not allege unequal pay for equal work." Plemer v. Parsons-Gilbane, 713 F.2d 1127, 1132 (5th Cir. 1983). See also Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1527 (11th Cir. 1992) (Gunther held that Title VII, 42 U.S.C. § 2000e-2(h), only incorporates the affirmative defenses of the EPA, not its prohibitory language requiring equal pay for equal work); Loyd v. Phillips Brothers, Inc., 25 F.3d 518, 525 (7th Cir. 1994) (even when jobs are not sufficiently similar to constitute "equal work" under the EPA, a Title VII claim for wage discrimination is not precluded; however, in an action under Title VII, plaintiff must show an intent and actual desire to pay women less than men because of gender).

In Tidwell, 989 F.2d at 410, we acknowledged that our statement in Ammons v. Zia Co., 448 F.2d 117 (10th Cir. 1971), that Title VII required a showing of equal work, must be treated as substantially modified by the Supreme Court in Gunther. We also acknowledged that Gunther emphasized that the purpose of the Bennett Amendment was to incorporate into Title VII the four affirmative defenses of the EPA, but not the EPA equal work requirement. Id. at 411.

Thus, "a female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid

13

males." Meeks, 15 F.3d at 1019. "Once a *prima facie* case is established, the defendant must articulate a 'legitimate, non-discriminatory reason for the pay disparity.' This burden is 'exceedingly light'; the defendant must merely proffer non-gender based reasons, not prove them." Id., (quoting Miranda, 975 F.2d at 1529). Once the defendant advances such a justification, the plaintiff must show that the defendant, regardless of the proffered reasons, intentionally discriminated against her. Id.; See also Tidwell, 989 F.2d at 409. That is, "the plaintiff must show that 'a discriminatory reason more likely than not motivated [the employer] to pay her less.'" Meeks, 15 F.3d at 1019 (quoting Miranda, 975 F.2d at 1529).

It is apparent from the record that Sprague failed to present genuine issues of material fact which would support her equal pay claim under Title VII. As the district court observed, Sprague contrasts her functions and pay in the jewelry department to those of the assistant product manager of electronics and the assistant product manager of furniture/appliances, both of whom are males. "However, the Electronics, Furniture/Appliances, and Jewelry Departments do not contribute equally to [Thorn's] revenues." See district court's Memorandum and Order at 5. While the electronics department comprises approximately 50% of revenues and the furniture/appliance department accounts for approximately 45% of revenues, the jewelry department only produces approximately 4% of revenues. Id. Thus, a difference in pay between Sprague and the assistant product managers is justifiable

14

and is consistent with the different levels of importance, value, and depth of responsibility between the respective departments.

Thorn also suggests that these higher paid managers had much greater marketing experience than Sprague, had a greater array of responsibilities, and that Sprague did not perform all of the functions in the jewelry department that these managers performed in their respective departments. Additionally, the district judge noted that Sprague did not receive high marks by Thorn's review committee, and, as "a result of the review, Sprague was eventually placed on an action plan to be let go." See district court's Memorandum and Order at 6. Further, the district judge recognized that although Sprague contends that she began to do the work of assistant product manager for jewelry in 1992 or January of 1993, Sprague expressed a goal in January of 1993 of being promoted to assistant product manager in June of 1993, "a career goal which was surely unnecessary if she had already achieved this position." Id. at 4. "Nor does evidence cited by Sprague support the conclusion that she was a de facto Assistant Manager." Id.

Given the evidence presented to the district court, we find that Sprague failed to present a *prima facie* case of intentional gender discrimination. The evidence shows a legitimate basis for the difference in pay, and none of the evidence presented by Sprague reveals a desire on the part of Thorn to intentionally pay her less because of her gender. Since there is no genuine issue of material fact regarding Sprague's

15

Title VII gender discrimination claim, summary judgment on that claim was appropriate.

## B. Equal Pay Act Claim

We now examine Sprague's claim under the EPA, 29 U.S.C. § 206(d)(1). The EPA provides that:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

To establish a *prima facie* case under the EPA, Sprague "has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) the male employees were paid more under such circumstances." Tidwell, 989 F.2d at 409 (citing Corning Glass Works v. Brennan, 417 U.S. 188 (1974)). "If a prima facie case is so established under the EPA the *defendant* must undertake the burden *of persuading* the jury that there existed reasons

for the wage disparity which are described in the [EPA]." Tidwell, 989 F.2d at 409 (emphasis in original). If the defendant fails in this respect, the plaintiff will prevail on her *prima facie* case. Id. Thus, under the EPA, "the onus is on the employer to establish that the pay differential was premised on a factor other than sex. Under Title VII, however, the plaintiff must prove that the employer had a discriminatory intent." Id.

Sprague contends that the district court erred in granting summary judgment on her EPA claim because there was a genuine issue of material fact as to whether she was paid less than two male employees for equal work in a job which required equal skill, effort, and responsibility and which was performed under similar working conditions. However, we agree with the district court that Sprague failed to produce evidence that her job functions were substantially similar to those of the male assistant managers. "The uncontroverted evidence is that Sprague was not an Assistant Manager, and that at most, she performed only 'some' functions of an Assistant Manager." See district court's Memorandum and Order at 11. The district judge concluded that because Sprague did not demonstrate that she occupied substantially the same position or performed substantially the same tasks as the assistant managers, her EPA claim must fail. We agree.

Much of our analysis regarding Sprague's equal pay claim under Title VII applies here as well. As previously noted, Sprague worked in a department which

produced less than one-tenth of the revenues of the departments managed by the male assistant managers. Such a substantial difference in revenues between Sprague's department and those departments managed by her male counterparts indicates that the tasks and functions performed by Sprague were quite dissimilar both in the level of experience required to adequately manage operations and the level of complexity in performing required functions. We are also persuaded that equal pay was not required due to the varied level of experience between Sprague and the male assistant managers, the somewhat poor review given to Sprague's performance, the recommendation that Sprague eventually be "let go", and the fact that no assistant manager position existed in the jewelry department.

We do not construe the "equal work" requirement of the EPA broadly, and we have stated that failure to furnish equal pay for "comparable work" or "like jobs" is not actionable. See, Nulf, 656 F.2d at 560 (citing Lemons v. City and County of Denver, 620 F.2d 228, 229-30 (10th Cir.), cert. denied, 449 U.S. 888 (1980)). Rather, in order to prevail in such an EPA action, the jobs "must be 'substantially equal' in terms of 'skill,' 'effort,' 'responsibility,' and 'working conditions.'" Nulf, 656 F.2d at 560 (citing Ammons v. Zia Co., 448 F.2d at 120). We conclude that, based on the materials submitted by the parties, it is clear that Sprague occupied a position and performed functions that were not "substantially equal" to those of the male assistant managers. At most, Sprague's job functions were merely comparable

18

to those of the assistant managers. Hence, the district court did not err in holding that no genuine issue of material fact existed and in granting summary judgment in favor of defendants on the EPA claim.

## C. Sexual Harassment

Sprague argues that the district court erred in granting summary judgment to defendants on her sexual harassment claim.[4] As discussed more fully below, Sprague alleges five separate incidents of allegedly sexually-oriented, offensive comments either directed to her or made in her presence in a sixteen month period. All such incidents involved Mr. Kowalski.[5] She further alleges that management was aware of at least three of these incidents, as well as a pattern of abuse directed toward other women by Kowalski, but that management refused to remedy the situation by placing her with a different supervisor.

---

[4]In Sprague's complaint, she alleged hostile work environment harassment as well as *quid pro quo* sexual harassment. See Harrison v. Potash, 112 F.3d 1437, 1443 (10th Cir.1997), for a discussion regarding the distinction between these types of prohibited conduct. However, on appeal Sprague directs her argument solely to hostile work environment harassment and we therefore assume that Sprague has abandoned her *quid pro quo* claim. Hence, we will focus exclusively on whether the district court erred in granting summary judgment against Sprague on her hostile work environment harassment claim.

[5] We note, however, that Kowalski was not Sprague's supervisor with respect to the three incidents occurring prior to June 1992. Kowalski became Sprague's supervisor after Sprague's review in June 1992, at which she was told that she "would be working specifically for the product group under Ed [Kowalski]." Sprague Dep., I Aplt. App. at 114.

19

It is beyond contention that Title VII prohibits sexual harassment in the workplace. Harrison v. Potash, Inc., 112 F.3d 1437, 1442 (10th Cir.1997) (citations omitted); 42 U.S.C. § 2000e-2(a)(1). Further, in certain circumstances, the employer can be held liable for an employee's sexually offensive conduct which creates a hostile work environment. Id. at 1443. However, prior to addressing the issue of whether summary judgment was properly entered in favor of Thorn as Kowalski's employer, we must first examine the evidence to determine if a genuine issue of material fact exists as to whether Kowalski's alleged conduct created a hostile work environment within the meaning of Title VII.

It is clear that not all "workplace conduct that may be described as 'harassment,' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). Rather, in order to prevail on a hostile work environment sexual harassment claim, Sprague is required to show that the unwelcome, sexually-oriented conduct was sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment. Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 782 (10th Cir.1995) (quoting Hirschfeld v. New Mexico Corrections Dep't., 916 F.2d 572, 575 (10th Cir.1990), and Meritor, 477 U.S. at 67). In determining whether Sprague made the requisite showing, we must consider a variety of factors, including, "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Moreover, whether the complained of conduct is sufficiently pervasive as to create a hostile work environment must be determined from the totality of the circumstances since no single factor is required. Id. at 23.

"A plaintiff may prove the existence of hostile work environment sexual harassment in violation of Title VII 'where [sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" Hirase-Doi, 61 F.3d at 782 (quoting Meritor, 477 U.S. at 65) (internal quotations omitted). In Harris, the Supreme Court held that a plaintiff bringing a hostile Title VII work environment sexual harassment claim must establish both an objectively hostile or abusive work environment and a subjective perception by the plaintiff that the environment was abusive. But Title VII comes into play before the harassing conduct leads to a nervous breakdown, and a discriminatorily abusive work environment, even one that does not seriously affect the employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Harris, 510 U.S. at 22. "So long as the environment would reasonably be perceived, and is perceived, as hostile

21

or abusive, <u>Meritor</u>, . . . there is no need for it also to be psychologically injurious." <u>Id.</u> See also <u>Hirase-Doi</u>, 61 F.3d at 782.

As noted above, the conduct allegedly creating a hostile work environment consisted of five separate incidents involving Kowalski over a span of approximately sixteen months. On one occasion in April 1992, when Sprague entered Kowalski's office, he allegedly said, "Shelley, you really need to undo that top button." Sprague Deposition, I Aplt. App. at 119. Sprague also complained of an incident in February or March 1992 where an unknown person asked, "Hey, are the girls going down to aerobics," to which Kowalski allegedly replied, "Hey, you can't call them girls. You have to call them ladies." Aple. Supp. App. at 38. Another incident allegedly occurred in May 1992 when Sprague, Kowalski, and two other employees were standing in a hallway. Kowalski allegedly "brought up the subject about women and PMS and you know how they are at that time of the month . . . ." I Aplt. App. at 120. As the district court noted in its Memorandum and Order granting summary judgment for defendants, p. 9, in January 1993, after the first three incidents described above, "Sprague stated in writing that she believed Kowalski helped her in her work and that she was 'happy' to work with him."

On March 20, 1993, Sprague got married. Her wedding reception was at Crestview Country Club. I Aple. Supp. App. at 55. Sprague stated in her deposition that:

22

Ed [Kowalski] was there, and he put his arm around me and I caught him looking down my dress. And, you know, I looked at him, and he said 'well, you got to get it when you can.' I was so uncomfortable and I was so embarrassed that I didn't even tell my husband for a few weeks because he would have been extremely upset, and he was when he heard it.

I Aplt. App. at 125. Finally, a week before Labor Day in 1993, in discussing what to call "neck chains," Sprague testified that she had said "neck chains," and "Ed said, 'neck chains! That sounds kind of kinky.'" Aple. Supp. App. at 56.

From the record evidence respecting the five incidents, it appears to us that unpleasant and boorish conduct by Kowalski was shown, but that Sprague was not, in fact, subjected to such offensive comments or conduct as to create a "hostile or abusive" work environment. Harris, 510 U.S. at 22. The incident at Sprague's wedding reception was the most serious, but it occurred at a private club, not in the workplace. Moreover, the conduct occurred sporadically over an extended period of some 16 months. Our review of the remarks allegedly made by Kowalski leads us to conclude that these remarks were not sufficiently severe or pervasive as to alter the condition of Sprague's employment and create an actionable hostile work environment.

In sum, considering Sprague's evidence concerning the five incidents at issue, the totality of the circumstances, and the standard of Harris and Meritor, which the district judge properly applied, there was not a showing by Sprague sufficient to avoid summary judgment on this claim. Sprague did not proffer evidence of sexual

23

harassment sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.

## D. Retaliatory and Constructive Discharge

Sprague contends that the district court erroneously granted summary judgment in favor of defendants on her claims of retaliatory and constructive discharge. However, we feel that the record clearly supports the district court's ruling.

As set out more fully above, Sprague's last day of work with Thorn was Friday, September 24, 1993. On the following Monday, Sprague called in sick with a sinus headache, and she never returned to work. However, Sprague continued to draw her full salary until October 28. On October 1, 1993, Sprague, along with her attorney, went to Thorn and indicated that she would be willing to return to work if, (1) Kowalski were not her supervisor, and (2) she be given the title and salary of product manager, retroactive to June 1992. Thorn refused to accept Sprague's demands. Although Sprague was repeatedly urged to return to work by representatives of Thorn, on November 1, 1993, Thorn deemed her to have abandoned her job and therefore terminated her.

These facts hardly support a claim of retaliatory discharge. As the district court noted, Sprague's claim of retaliatory discharge is based largely on the fact that she hired an attorney and that Thorn refused to accept her conditions for returning to work. We have held that in order to establish a *prima facie* case of retaliatory

discharge, a plaintiff must show: (1) she engaged in protected activity; (2) she subsequently suffered adverse action by the employer; and (3) there was a causal connection between the protected activity and the adverse action. Richmond v. Oneok, Inc., 120 F.3d 205, 208-09 (10th Cir.1997); Archuleta v. Colorado Dep't of Institutions, Division of Youth Services, 936 F.2d 483, 486 (10th Cir. 1991). However, as the district court correctly recognized, Sprague failed to identify any action by Thorn, "other than her termination after not returning to work for several months, which supposedly reflects . . . wrongful adverse job action." See district court's Memorandum and Order at 11. There is no indication that Thorn terminated Sprague because she attempted to engage in protected activity or because she exercised legal rights. On the contrary, the record supports the conclusion that Sprague was terminated because she refused to return to work after a period of prolonged absence. Thus, we conclude that Sprague failed to show that any genuine issue of material fact existed with respect to her retaliation claim, and summary judgment was therefore properly granted in favor of defendants.

Turning to Sprague's constructive discharge claim, we similarly conclude that Sprague failed to present material facts which support her claim. A plaintiff alleging constructive discharge must show that the employer by its unlawful acts made working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign. Thomas v. Denny's Inc., 111 F.3d 1506, 1514 (10th Cir.

25

1997) (citing <u>Spulak v. K Mart Corp.</u>, 894 F.2d 1150, 1154 (10th Cir. 1990)). We agree with the district court that Sprague offered no evidence such that a reasonable person would have viewed her working conditions as intolerable. Accordingly, the district court properly granted summary judgment in favor of defendants on this claim.

## E.  Motion to Compel Discovery

### I

We lastly review the district court's denial of Sprague's motion to compel production of documents, particularly a memorandum prepared by in-house counsel Doug Westerhaus for management, and testimony by Westerhaus in response to 42 questions which he refused to answer on his counsel's advice and assertion of privilege.

Sprague took the deposition of Westerhaus on October 24, 1995. Following the deposition, on November 22, 1995, Sprague filed a motion to compel with a supporting memorandum, and she subsequently filed an addendum to the supporting memorandum on December 1, 1995. II Aplt. App. at 256, 258, 335. Sprague sought to compel the production of documents by Westerhaus relevant to the deposition inquiries, testimony by Westerhaus regarding 42 questions Westerhaus was instructed not to answer by defendants' counsel based on attorney-client and work product privileges, and, in particular, the production of a memorandum prepared by

26

Westerhaus for Thorn's senior management, allegedly addressing disparate treatment of women at Thorn. On appeal, Sprague has focused her arguments mainly on the memorandum. See, e.g., Appellant's Reply Brief at 10-12.

There was apparently no substantial argument below on Sprague's motion to compel. The motion was disposed of by the trial judge in his Memorandum and Order, which denied the motion to compel and granted the defendants' motion for summary judgment. II Aplt. App. at 396-408. The order states in part:

> The court has at hand the plaintiff's motion to compel the production of documents and testimony from Doug Westerhaus, an attorney employed by the defendant THORN Americas. The court finds that the motion to compel should be denied, since the matters sought to be discovered reflect privileged information and the plaintiff has failed to identify any actions by the defendant indicating a waiver of that privilege.

Id. at 396.

## II

We review rulings related to discovery under an abuse of discretion standard. Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995) (quoting Johnson v. Thompson, 971 F.2d 1487, 1497 (10th Cir. 1992), cert. denied, 507 U.S. 910 (1993)). Although discovery in discrimination cases should not be narrowly circumscribed, the desire to afford "broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and

defendant." <u>Gomez</u>, 50 F.3d at 1520 (quoting <u>Scales v. J.C. Bradford & Co.</u>, 925 F.2d 901, 906 (6th Cir. 1991)).

This discovery issue turns on the claim of attorney-client privilege and attorney work product privilege. In addressing the issue, we face consideration of both federal and Kansas law since both federal claims and state law pendent jurisdiction claims are asserted in the instant case.[6] The briefs of Sprague on appeal make no argument focusing on any distinction between federal and state law and cite only one federal case and Fed. R. Civ. P. 26b(5) with its provisions concerning the required procedure when a party withholds information, otherwise discoverable, by claiming privilege or protection of it as trial preparation material. Brief of Appellant at 26-27; Appellant's Reply Brief at 10-12. The defendants likewise make no assertion as to the applicability of federal as opposed to state law, or the reverse, in their brief before us, although they cite our <u>Gomez</u> opinion on the scope of review and <u>Upjohn Co. v. United States</u>, 449 U.S. 383 (1981), in support of their

---

[6]In the Brief of Appellant at 1-2, plaintiff Sprague alludes to her several federal claims and also to her claims under the Kansas Acts Against Discrimination, K.S.A. § 44-1001, <u>et</u> <u>seq.</u> Sprague does not separately argue her state and federal claims and instead asserts general arguments of alleged errors in the rulings on her claims of sex discrimination, sexual harassment, violation of the Equal Pay Act, and retaliatory and constructive discharge. The standards governing sexual harassment claims under the Kansas statute are identical to those under Title VII in any event. <u>Ulrich v. K-Mart Corp.</u>, 858 F. Supp. 1087, 1091 n.4 (D. Kan. 1994); <u>see also</u> <u>Reber v. Mel Falley, Inc.</u>, 683 P.2d 1229, 1230-32 (Kan. 1984).

attorney-client privilege claim concerning the Westerhaus memorandum. Brief of Appellees at 28-29.

In Motley v. Marathon Oil Co., 71 F.3d 1547 (10th Cir. 1995), cert. denied, 116 S. Ct. 1678 (1996), the plaintiff asserted both federal and state claims. We said that as to the state causes of action, a federal court should look to state law in deciding privilege questions, citing Fed. R. Evid. 501 and White v. American Airlines, Inc., 915 F.2d 1414, 1424 (10th Cir. 1990). Motley, 71 F.3d at 1551. Rule 501 provides in part that in civil actions and proceedings, with respect to an element of a claim or defense as to which state law supplies the rule of decision, privilege of a witness or person, *inter alia*, shall be determined in accordance with state law. In White v. American Airlines, Inc., 915 F.2d 1414 (10th Cir. 1990), we applied Oklahoma law in deciding an attorney-client privilege question in a civil case based on a state cause of action, where the case had been removed to federal court. Id. at 1423-24.

Here, with both federal claims and pendent state law claims implicated, we should consider both bodies of law under Motley and Fed. R. Evid. 501. If the privilege is upheld by one body of law, but denied by the other, problems have been noted. "In this situation, permitting evidence inadmissible for one purpose to be admitted for another purpose defeats the purpose of a privilege. The moment privileged information is divulged the point of having the privilege is lost." 3

29

Weinstein's Federal Evidence, § 501.02[3][b] (Matthew Bender 2d ed.) (citing

Perrigon v. Bergen Brunswig Corp., 77 F.R.D. 455, 458 (N.D. Cal. 1978)).  If such

a conflict on the privilege exists, then an analytical solution must be worked out to

accommodate the conflicting policies embodied in the state and federal privilege

law.[7]  Here, however, for reasons given below we are convinced that both federal and

Kansas law support application of the attorney-client privilege.  Therefore we need

not articulate an analytical solution here for conflicts in attorney-client privilege

rules.

We turn now to the consideration of the merits of the privilege claims here.

### III

---

[7]See, e.g., Hancock v. Hobbs, 967 F.2d 462, 466-67 (11th Cir.1992) (federal law applied rejecting psychiatrist-patient privilege claim in § 1983 case although pendent state law counts were asserted and conflicting state law might provide different result);  Hancock v. Dodson, 958 F.2d 1367, 1372-73 (6th Cir. 1992) (In federal question case involving a § 1983 claim, existence of pendent state law claims held not to relieve court of obligation to apply federal law of privilege); United States v. Prouse, 945 F.2d 1017, 1024 (8th Cir. 1991) (Minnesota statutory privilege against use of test result from employer's drug or alcohol testing program not applied due to Fed. R. Evid. 501 instruction "to apply privileges in light of reason and experience");  von Bulow v. von Bulow, 811 F.2d 136, 141 (2d Cir. 1987) (where federal RICO claim was asserted along with pendent state law claims and a diversity claim, it was held that federal law of privilege controlled question of journalist's privilege);  Wm. T. Thompson Co. v. General Nutrition Corp., 671 F.2d 100, 104 (3d Cir. 1982) (when there are federal claims in a case also presenting state law claims, federal rule favoring admissibility rather than state law privilege is the controlling rule);  Memorial Hospital for McHenry County v. Shadur, 664 F.2d 1058, 1061 and n.3 (7th Cir. 1981) (in federal antitrust suit with pendent state law claim, federal rule denying privilege applied to reject privilege claim under state Medical Studies Act).

30

Plaintiff Sprague supported her motion to compel discovery with an affidavit of Ms. Melanie Owens which was attached to her memorandum in support of her motion to compel. II Aplt. App. 283-85. The principal facts are stated in the affidavit of Owens, who was employed by Thorn for some six years from early January 1990 until September 1995. Her affidavit states she filled the position of Manager of Compensation in the Human Resources Department during her employment with Thorn. Her responsibilities included developing and implementing salary range structures and incentive programs, evaluating jobs and placing them in a salary range, researching compensation schemes, *inter alia*. Id.

On July 12, 1995, at about 6:15 p.m. as Owens exited the building after work, she saw Doug Westerhaus in the parking lot. He was the staff attorney at Thorn responsible for the Human Resources Department. Westerhaus indicated he wanted to talk with Ms. Owens. During the course of their conversation, Westerhaus advised Ms. Owens, according to the affidavit, that he was concerned about the disparate treatment of women at Thorn, mentioning specific women employed at Thorn. The critical portion of the affidavit stated:

> 7. Westerhaus proceeded to inform me that he had sent a memorandum addressing the subject of the disparate treatment of women by the company to Mr. Dave Egan, Senior Vice President and General Counsel for THORN. Westerhaus said he intended to follow up on the subject of the memorandum with Egan and other members of senior management including Mr. Alan St. Clair, Vice President of Human Resources.

31

II Aplt. App. 283.

Owens' affidavit says that she told Westerhaus her department had been responsible for preparing historical data, including graphic analysis and backup information for the Legal Department that provided statistical support for the memorandum. Westerhaus said that he had reviewed that information, and that information made available to him indicated that women received disparate treatment at Thorn. Westerhaus commented on the fact that there were no women in executive level positions with the company, which amounted to disparate treatment. The affidavit continues with specific examples given by Westerhaus dealing with the allegedly disparate treatment. The conversation of Owens and Westerhaus lasted between 15 and 30 minutes. II Aplt. App. 284-85.

We are persuaded that the critical memorandum of Westerhaus is protected by the attorney-client privilege. It was prepared for higher management by in-house counsel acting within the scope of his employment and, as paragraph 7 of the affidavit demonstrates, it related to the rendition of legal services and advice. As the Supreme Court has noted, "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." Upjohn Co. v. United States, 449 U.S. at 390; United States v. Amerada Hess Corp., 619 F.2d 980, 986 (3d Cir. 1980) ("Legal advice or opinion from an attorney to his client, individual or

32

corporate, has consistently been held by the federal courts to be within the protection of the attorney-client privilege"); Natta v. Hogan, 392 F.2d 686, 692-93 (10th Cir. 1968) ("The recognition that privilege extends to statements of a lawyer to a client is necessary to prevent the use of the lawyer's statements as admissions of the client").

A dichotomy in treatment of the attorney-client privilege has been noted in several cases. In Loftis v. Amica Mutual Insurance Co., _____ F.R.D. _____, 1997 WL 453173 (D. Conn. 1997), the two general approaches were discussed. Under a narrower approach, the attorney-client privilege is held not to protect from disclosure a legal opinion and advice communicated in confidence by an attorney to his client where that opinion and advice do not reveal client confidences. Id. at *4. Predicting Connecticut law, Loftis held that the narrower approach should be applied and a letter from counsel to the client was denied protection. Id. at *5.

Loftis noted, however, that some courts have held that the privilege protects communications from the lawyer, regardless of whether the lawyer's communications reveal confidences from the client, citing United States v. Amerada Hess Corp., discussed above. Id. at *3. This broader approach has been applied in cases holding that any communication from an attorney to his client made in the course of giving legal advice is protected. In re LTV Securities Litigation, 89 F.R.D. 595, 602 (N.D. Tex. 1981). The LTV opinion rejects the narrower view, pointing out that the

predictability of confidence is central to the role of the attorney and that "[a]doption of such a niggardly rule has little to justify it and carries too great a price tag." Id. at 602. The LTV opinion concludes that a broader rule prevails in the federal courts, one that protects from forced disclosure any communication from an attorney to his client when made in the course of giving legal advice, citing our opinion in Natta v. Hogan, discussed earlier. Id. The distinction between the narrow and broad approaches was also noted in Potts v. Allis-Chalmers Corp., 118 F.R.D. 597 (N.D. Ind. 1987). The court there concluded that attorneys' communications to their clients are not uniformly privileged but that resolution of the conflict of case law was not necessary for decision in that case. Id. at 603.

We are persuaded that our Natta v. Hogan opinion, 392 F.2d at 692-93, does represent an application of the broader rule, which was the view of the LTV opinion. We are further persuaded that under the wording of the statutory privilege in Kansas, K.S.A. § 60-426, the Kansas courts would apply the broader rule. That statute protects, *inter alia*, "communications found by the judge to have been between lawyer and his or her client in the course of that relationship and in professional confidence . . . ." § 60-426(a). Also K.S.A. § 60-426(c) defines "communication" to include "*advice given by the lawyer in the course of representing the client* and includes disclosures of the client to a representative, associate or employee of the lawyer . . . ." (Emphasis added). In State of Kansas v. Breazeale, 713 P.2d 973

34

(Kan. App. 1986), the court held that the "lawyer-client privilege protects statements transmitting information between a lawyer and his client that are made in professional confidence." (Syllabus 1 by the court). Because of the breadth of the language of the Kansas statute and the opinion interpreting it, we are convinced that the Kansas courts favor the broader approach, namely protecting an attorney's communications to his client without the qualification that the communications must contain confidential matters revealed by the client earlier to the attorney.

One further argument of plaintiff Sprague against application of the privilege is that Westerhaus has not produced any facts establishing a basis for withholding the memorandum and that he therefore should be compelled to produce it, along with all other items described in the deposition subpoena. Brief of Appellant at 27. We disagree. Owens' affidavit, attached to the motion to compel of plaintiff Sprague, itself asserted the relationship of Westerhaus as an attorney, that the memorandum addressed the legal subject of allegedly disparate treatment of women by the company, and that the memorandum had been sent to members of senior management of Thorn. II Aplt. App. at 283-85. These circumstances properly supported application of the attorney-client privilege, unless there was a waiver or other special ground for disregarding the privilege. We will now discuss those questions as argued by Sprague.

We are not persuaded by Sprague's contention that the attorney-client privilege was waived here. As the Supreme Court has noted, "the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348-49 (1985). Hence, "a corporate employee cannot waive the corporation's privilege." United States v. Chen, 99 F.3d 1495, 1502 (9th Cir. 1996), cert. denied, 117 S. Ct. 1429 (1997); In re Claus von Bulow, 828 F.2d 94, 100-101 (2d Cir. 1987). Here there is no showing that the officers or directors of Thorn ever expressly or impliedly waived the attorney-client privilege of the corporation with respect to the memorandum as required by federal law. We must also consider the Kansas law on the attorney-client privilege since Sprague asserts both federal claims and Kansas pendent state law claims. Kansas affords protection by statute to the privilege, giving the same basic protection to communications between lawyer and client which we discussed in Natta v. Hogan, 392 F.2d at 692-93, in treating federal law on the attorney-client privilege. See K.S.A. § 60-426.[8] Further, the waiver of the privilege is confined to circumstances

---

[8]The Kansas attorney-client privilege is afforded by K.S.A. § 60-426, which provides in part:

60-426. Lawyer-client privilege.

    (a) General rule. Subject to K.S.A. 60-437, and except as
                            (continued...)

36

where the judge may find that the client (a person or corporation, directly or through an authorized representative) has waived the privilege in accordance with the conditions in the Kansas statutes. K.S.A. § 60-437. Here no such waiver satisfying the Kansas requirements is shown.

There remains the contention by plaintiff Sprague that the attorney-client privilege does not apply because of the crime or fraud exception. Brief of Appellant at 28. We have recognized that there is an exception under federal law that "the attorney-client privilege does not apply where the client consults an attorney to further a crime or fraud." Motley, 71 F.3d at 1551 (quoting In re Grand Jury Proceedings, 857 F.2d 710, 712 (10th Cir. 1988), cert. denied, 492 U.S. 905 (1989)). In Kansas there is also a statutory provision that the attorney-client privilege and others do not extend to a communication if there was sufficient evidence that the

---

[8](...continued)
otherwise provided by subsection (b) of this section communications found by the judge to have been between lawyer and his or her client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege (1) if he or she is the witness to refuse to disclose any such communication, and (2) to prevent his or her lawyer from disclosing it, and (3) to prevent any other witness from disclosing such communication if it came to the knowledge of such witness (i) in the course of its transmittal between the client and the lawyer, or (ii) in a manner not reasonably to be anticipated by the client, or (iii) as a result of a breach of the lawyer-client relationship. The privilege may be claimed by the client in person or by his or her lawyer, or if an incapacitated person, by either his or her guardian or conservator, or if deceased, by his or her personal representative.

communication was sought to enable or aid the commission or planning "of a crime or a tort . . . ." K.S.A. § 60-426(b). See Burton v. R. J. Reynolds Tobacco Co., 167 F.R.D. 134, 140-41 (D. Kan. 1996); In re A. H. Robins Co., Inc., 107 F.R.D. 2, 9 (D. Kan. 1985). However, Sprague points to no record evidence to support a contention that Westerhaus' advice was sought to perpetuate a crime, a fraud or a tort, and we have found none.

In sum, we are convinced that under federal and Kansas law the critical memorandum and information sought by the motion to compel are protected by the attorney-client privilege. Since this privilege applies, it is unnecessary for us to consider the work product privilege. We are persuaded that the district judge properly denied the motion to compel.

Accordingly, the judgment of the district court is **AFFIRMED.**