Zora L. **TOTH**, Ph.D., Plaintiff,

v.

**GATES RUBBER COMPANY,**
Defendant.

**No. 97–WY–2662–AJ.**

United States District Court,
D. Colorado.

Dec. 15, 1998.

Lee Thomas Judd, Andrew T. Brake, PC, Englewood, CO, for Zora L. Toth, Ph.D., plaintiff.

David Bradley Ellis, Michael D. Plachy, Rothgerber, Johnson & Lyons, LLP, Denver, CO, for Gates Rubber Company, defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ALAN B. JOHNSON, Chief Judge.

The defendant's motion for summary judgment, the plaintiff's response thereto, and the defendant's further reply came before the Court for hearing. Following the hearing, the Court permitted plaintiff to file additional materials in support of her opposition to the motion. The Court, having considered the arguments of counsel at the hearing, reviewed the parties' submissions and the pleadings of record, the applicable law, and being fully advised, FINDS that the defendant's motion for summary judgment should be GRANTED, for the reasons stated below.

### Background and Contentions of the Parties

This is an employment case. Plaintiff, a citizen of Yugoslavian origin, is a female who was 59 years old when the complaint was filed. She was employed with defendant Gates as a research chemist. She began her employment with Gates on May 29, 1973 and was terminated in June of 1997. Plaintiff asserts six claims for relief in her complaint, including: 1) breach of express or implied contract; 2) promissory estoppel; 3) retaliation; 4) sex discrimination in violation of Title VII; 5) national origin discrimination; and 6) violation of the Equal Pay Act.

Plaintiff's submissions offer the following background. Plaintiff immigrated to the United States in 1967. She has a Bachelor's Degree in Chemistry, and a Master's Degree in Chemistry, received in 1961 from the University of Belgrade, Yugoslavia. She received a Ph.D. in Chemical Engineering from Century University in 1987. When she was initially employed by Gates on May 29, 1973, she was hired in a research librarian position. She signed a job application, which stated in part, "This company has a policy of employment on merit without discrimination because of age, race, color, religion, creed, national origin or sex."

During the times she has been employed with Gates, plaintiff has held various positions, including that of Chemist Research Librarian; Research Chemist I, and Senior Research Chemist I. She states that she has also conducted various research projects and generated numerous research reports and project proposals and approximately 20 statements of invention. She has lectured and presented technical papers to outside organizations and has attended various continuing education classes.

Plaintiff asserts that at all times during her employment with Gates, she performed her job duties in a competent and efficient manner, which was recognized by commendations and awards received while so employed. She states that to meet the heavy work load, she frequently worked extended hours and late at night at home. Over the years, she accumulated at her home working copies of matters on which she was working. She asserts this was known to Gates.

In October of 1995, plaintiff was transferred to the Materials Analysis Lab. She contends this was a demotion for her, because up until that time, the analysts assisted her in the performance of her work for Gates, although the transfer did not affect her rate of pay or benefits. In October 1995, plaintiff was performing analyst work, a position for which she claims she was overqualified. January 1, 1996, Douglas Schneider became plaintiff's supervisor. Plaintiff alleges that Schneider, along with Steve Leatherland, engaged in a continuing and ongoing pattern of discrimination and/or harassment directed toward her, based upon her national origin and gender. Prior to that time, she states that there had never been any questions, concerns, or comments which indicated any negative perception of her job performance over her 22 years with Gates.

Early in 1996, plaintiff was written up and subjected to adverse action as a result of contentions that the quantity of her work was deficient. In May, 1996, she alleges she was effectively demoted as a result of these performance issues when she was advised that Leatherland, a "peer" up until that time, was to be her supervisor. She was also informed that her reports were to be approved by Leatherland and that she was to make any changes requested by Leatherland, even if she disagreed with the changes or believed them to be erroneous. She contends that Leatherland would hold her reports for extended periods of time and that she was

chastised or disciplined because the reports held by Leatherland had not been released to the client. She claims that she was criticized and disciplined for her report writing and ability to communicate, and alleges the basis of this criticism and discipline was her national origin. She contends that she was terminated March 26, 1997 for those same reasons.

Plaintiff asserts that her termination came only after continuing and ongoing harassment, including that relative to the work backlog, when others who were male or not from plaintiff's country of origin were not disciplined or criticized even though they had equal or greater backlogs. Plaintiff has also alleged that others, David Hudgins and Cathy Johnson, were performing at a level lower than she in terms of quantity and quality, without being subjected to similar discipline. She also contends records about her performance were altered to show fewer samples analyzed than she really performed. She alleges that she received disparate treatment while employed at Gates. The reason given for plaintiff's termination by Schneider was lack of performance. This, she contends, is without merit or basis in fact and is nothing more than pretext. She argues that Schneider, who admits he relied on information provided to him by Leatherland regarding plaintiff's performance, was wrong in relying on that information, and claims that defendant Gates had no reason whatsoever to terminate plaintiff's employment. Plaintiff states that she objected to her negative performance reviews and that, in her own estimation, the information did not "present a true picture" of her performance. Plaintiff's deposition, at 545.

Plaintiff contends that when she first encountered the alleged discriminatory and/or harassing conduct, she reported it to Gates' management and to individuals in the Human Resources and Legal Departments. Notwithstanding her written and oral complaints, no action was taken to correct conduct she claims was in violation of the Gates' policies, practices and procedures outlined in the application for employment and the employee handbook. She contends that instead, she was subjected to retaliation, including the denial of necessary equipment and/or a safe working environment, further harassment and discrimination such as unjustified write-ups for alleged work deficiencies. Plaintiff states that she was told her performance evaluation would be negative because of "her creating so much negative stuff around Gates[.]" She claims that Schneider also stated that her EEO complaints had made his year miserable. Thus, she contends that the negative job evaluation she received was a direct result of her complaints of discrimination and harassment. She was ultimately placed on probation and terminated, although there was no basis for doing so.

When plaintiff was placed on probation, she states that she and Schneider specifically agreed that if the requirements of probation were met, her employment with Gates would continue and she would not be terminated. This agreement, plaintiff states, is consistent with her understanding that Gates had a policy of employment on merit. The position from which she was terminated was filled by a white male approximately 30 years of age, with a bachelor's degree in chemistry and a recent graduate who has, plaintiff asserts, limited experience. Plaintiff argues that she met the requirements of the agreement with Schneider, confirmed by Leatherland's statements that he [Leatherland] knew of no reason to terminate plaintiff. Despite her compliance with the agreement with Schneider, that agreement was breached when she was terminated from her employment with Gates.

Plaintiff contends that throughout her employment with Gates, remarks were made, "by tone and content," indicating a bias toward her on the basis of national origin. She points to statements Schneider made stating that he could not understand plaintiff's English and that her technical writing was poor. She also claims Schneider made comments to Leatherland about plaintiff's educational background, indicating somehow that her Yugoslavian education was inferior. She cites other comments made by Phil Patterson and Hudgins, (co-workers), and an engineer that are claimed to be indicative of bias against plaintiff on the basis of national origin. Plaintiff alleges she was told "by an engineer" it was a man's world and that Gates did not want her European experience around there. In Schneider's department only three em-

ployees were women, and of those three, only one remains.

In 1997, plaintiff applied for a position in the Air Springs Department. She states she had held that position previously and had performed successfully in that position. Plaintiff was not given the position she sought and instead, the job was given to a male of American descent (Mr. Larmi) that plaintiff again claims was less qualified than she. Plaintiff admits she does not know the particulars of all of Larmi's qualifications, but simply states he is not a professional chemist (as she says she is), and that he apparently had no statements of invention or prior experience in the Air Springs Department.

Plaintiff states that in 1995, prior to the promotion when he became her supervisor, Schneider was a peer who had a similar job with fewer job responsibilities than plaintiff. Plaintiff asserts she was paid less than Schneider at that time. She also claims that in 1996, after Schneider became plaintiff's supervisor, she was also a peer with Mr. Hudgins, who was also paid more than she and was less qualified than she. Plaintiff states it is her understanding that Hudgins, Leatherland, and Schneider are less qualified for the work she performs yet they are paid more.

Plaintiff complains she was subjected to constant pressure, humiliation and demands in violation of Gates' policies, practices and procedures. She relies on the employee handbook, and the language in the employment application to support her position. Plaintiff contends the employment application constitutes a contract, which imposed terms and conditions upon her employment with Gates and a corresponding obligation upon Gates to abide by its own policies.

In its Motion for Summary Judgment, defendant argues that the undisputed facts demonstrate plaintiff has no claim for breach of contract or promissory estoppel. Plaintiff has contended that she had a contractual right to continued employment pursuant to (1) Gates' Policies and Procedures; (2) the Employee Handbook for Gates; (3) the Application for Employment; and (4) oral statements of her supervisor, Mr. Schneider. Defendant counters, by arguing that the at-will

employment relationship has not been altered by any specific promises in these documents and that the statements plaintiff relies upon are merely statements of policy. She had specific notice that her employment was at-will and was not promised continued employment.

The Policies and Procedures Manual includes the following language, on a separate page in the front of the manual in type different from that used in the rest of the manual:

### IMPORTANT NOTICE TO ALL EMPLOYEES

*The information contained in this Personnel Policies and procedures Manual is intended to provide guidance for Gates' personnel-related practices and is not a guarantee of employment nor an expressed or implied contract. Gates specifically reserves to itself the right, without notice to its employees, to unilaterally change, add to, suspend, interpret or cancel any provision of this Personnel Policies and Procedures Manual. Any employee's failure to observe any provision of these guidelines could result in disciplinary action, including termination, being taken against the employee.*

*Employment with Gates is terminable at the will of either the employee or Gates, at any time, without notice, without cause, and without any specific prior disciplinary procedures.*

Exhibit A, attached to defendant's memorandum.

Exhibit B, attached to defendant's memorandum, the Employee Handbook, includes the same type of notice:

### IMPORTANT NOTICE TO ALL ASSOCIATES

The information contained in this Associate Handbook is intended to provide general information about Gates' practices and programs and does not constitute an expressed or implied contract guaranteeing the rights of any associate permanently. Gates specifically reserves the right, without notice to its associates, to unilaterally

modify, add to, suspend, interpret or cancel any provisions of this Associate Handbook. Employment with Gates is terminable at the will of either the associate or Gates, at any time, without notice, cause or any specific disciplinary procedures, except as otherwise stated herein.

The application for employment (Exhibit D, defendant's memorandum) provides, in part:

If employed by The Gates Rubber Company or any associate company or companies, it is not for a definite period and may be terminated at any time by either party upon such notice as the one terminating it feels should be given. . . .

Defendant argues, as to plaintiff's first (breach of contract) and second (promissory estoppel) claims for relief, that summary judgment should be entered to deny claims that are based on a handbook where the employer has clearly and conspicuously disclaimed intent to enter into a contract limiting the right to discharge employees. Defendant argues that statements to employees, as well as the statements of general policies, do not alter the at-will employment relationship because the statements are not specific, definite, or material promises. Statements which are merely a description of the employer's present policies or a forecast of the employee's likely career progression are neither promises nor statements that could reasonably be relied upon as a commitment or promise for continued employment. In this case, defendant characterizes the statements plaintiff relies upon as statements of policies, such as "this company has a policy of employment on merit without discrimination" and the purpose of the company was "to attract, retain and motivate the caliber of associates Gates needs to meet its needs and objectives."

Defendant also argues that the first and second claims are barred by the undisputed evidence of plaintiff's failure to return Gates' proprietary trade secret documents after termination—an after-acquired evidence defense, which is, as to the state law claims, a complete defense. *Crawford Rehabilitation Services, Inc. v. Weissman,* 938 P.2d 540 (Colo.1997), following *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) [a partial defense to federal civil rights statutes, cutting off a plaintiff's ability to recover front pay and seek reinstatement]. Defendant suggests that plaintiff misappropriated and retained confidential information which makes application of the after-acquired evidence defense appropriate.

Defendant argues the Title VII claims for national origin and gender discrimination are without merit. Plaintiff has offered no evidence from which a reasonable fact finder could conclude she was subjected to a hostile work environment. The burden shifting scheme of *McDonnell Douglas* requires a plaintiff to establish a prima facie case, and then places upon the defendant the burden of producing an explanation rebutting the prima facie presumption or of producing evidence that its employment actions were taken for legitimate, nondiscriminatory reasons. If the defendant carries this burden and rebuts the presumption, the burden shifts back to the plaintiff to prove pretext or that the proffered justification was not the true reason for the employer's decision and that discrimination was. Defendant contends plaintiff was terminated for poor performance and that plaintiff has failed entirely to present any evidence whatsoever which shows pretext or that she was the victim of national origin and gender discrimination.

As to the hostile work environment claim, plaintiff must demonstrate 1) harassment was pervasive or severe enough to alter the terms conditions or privileges of employment and 2) that the harassment stemmed from national origin and/or gender animus. Casual comments or conversation will not trigger a hostile work environment claim. Defendant contends plaintiff has no evidence whatsoever to support the claims that she was harassed because of national origin and/or gender.

As to plaintiff's failure to promote claims, defendant argues any claims that plaintiff was denied a promotion more than 300 days before filing her EEOC charge are time-barred. With one exception, plaintiff's failure to promote claims are based upon promotions plaintiff claims she did not receive in early 1995 or earlier. Her EEOC charges was not filed until August 13, 1996. As to

the claim plaintiff was not promoted in February 1997, defendant argues plaintiff has no evidence to sustain this claim and that plaintiff was not promoted by defendant into the position she sought for legitimate business reasons. The person (a male) who was promoted was better qualified for the job. Plaintiff has admitted she did not know the job requirements for the position or those of the person who was promoted.

Defendant argues further that plaintiff's retaliation claim fails because she had no evidence to prove any causal connection between any complaints of discrimination plaintiff made and the conduct complained of. Plaintiff's claim is based on unsupported inference that, because she complained of perceived discrimination while at Gates, those complaints had to be the reason why she was not promoted and/or was terminated.

The essence of plaintiff's Equal Pay Act claim is that she was not paid as much as her supervisors. Again, defendant argues plaintiff has not proved that her position and the positions of those she has compared herself to were substantially equal in terms of skill, effort and responsibility.

Plaintiff, in response has argued that the defendant's motion does not meet the requirements of Rule 56. She opposes the defendant's motion for summary judgment.

## Standard of Review Fed.R.Civ.P. 56

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Allen v. Muskogee, Oklahoma*, 119 F.3d 837, 839–840 (10th Cir.1997). A disputed fact is material if it might affect the outcome of the suit under governing law. The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. The factual record and reasonable inferences therefrom are construed in the light most favorable to the nonmovant. *Id.*, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Gullickson v. Southwest Airlines Pilots' Assoc.*, 87 F.3d 1176, 1183 (10th Cir.1996). The moving party need not affirmatively negate the nonmovant's claim in order to obtain summary judgment, but instead bears the initial burden of showing—

that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case. *Id.*, quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## Discussion

The Court is persuaded that the defendant has made the better arguments in this case and that the case law cited supports its position. The plaintiff was an at-will employee; the policies she relies on are guidelines and do not rise to the level of a contract. In any event, she was not performing as well as she claims and could be terminated at any time from her employment with Gates, even without reason. The company allowed her a significant period of time to improve her work and she failed to do so. No evidence supports plaintiff's discrimination claims. Most of the evidence plaintiff relies on in support of her arguments is nothing more than self-serving conclusion and opinion. Plaintiff has presented no evidence or affidavits that suggest that Gates' reasons for her termination are pretext or stated otherwise, unworthy of belief. Her various claims will be discussed below.

## 1. Federal Discrimination Claims

Plaintiff's federal discrimination claims constitute a hodge-podge of claims of violations of federal law. She asserts discrimination on the basis of sex, age, and national origin, in which defendant failed to promote and advance plaintiff, a hostile working environment, retaliation, and violations of the Federal Equal Pay Act. The Court will address plaintiff's federal discrimination claims generally in this following section.

## A. Title VII

Title VII provides:

It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employ-

ment, because of such individual's race, color, religion, sex, or national origin[.]

42 U.S.C. § 2000e–2(a)(1).

Title VII claims of discrimination take many forms—most of which have been asserted in this case by plaintiff. These will be discussed separately in the following sections of this Order.

## B. Disparate treatment theory

■ A plaintiff may proceed under a disparate treatment theory, proving disparate treatment by direct or indirect evidence. Direct evidence of discrimination is evidence of "an existing policy which itself constitutes discrimination." *Aleman v. Sharp,* 156 F.3d 1243 (Table), Unpublished Disposition, Text at 1998 WL 480154 (10th Cir.1998), quoting *Ramsey v. City & County of Denver,* 907 F.2d 1004, 1008 (10th Cir.1990). Statements which are merely expressions of personal opinion or bias do not constitute direct evidence of discrimination. *Id.,* quoting *EEOC v. Wiltel, Inc.,* 81 F.3d 1508, 1514 (10th Cir. 1996). Where indirect evidence of discrimination is presented, the Court is to employ the burden-shifting analysis of *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.*

> In a claim of discrimination based on disparate treatment, plaintiff bears the initial burden of establishing a prima facie case in Title VII actions. A presumption of discrimination arises once the plaintiff establishes a prima facie case, but the defendant can rebut the presumption by producing some evidence that it had legitimate non-discriminatory reasons for its action. See *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Sorensen v. City of Aurora,* 984 F.2d 349, 352 (10th Cir.1993). "At the summary judgment stage, it then becomes the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995).
>
> In establishing a prima facie case of disparate treatment gender discrimination, plaintiff must show: (1) she belonged to the protected class; (2) she was adversely

affected by the employer's action; (3) she was qualified for the position; and (4) she was treated less favorably than her male counterparts. See *Cole v. Ruidoso Mun. Schools,* 43 F.3d 1373, 1380 (10th Cir.1994).

*Id.,* at 1998 WL 480154, *3. See also Trujillo v. University of Colorado Health Sciences Center,* 157 F.3d 1211, 1215 *(10th Cir.1998) (discussing disparate treatment claim analysis, among other things).

■ The Court finds that plaintiff's claims for national origin and gender discrimination are without merit. The plaintiff has failed to prove one of the essential elements for establishing a prima facie case, i.e., that she was qualified for the job. While she lists her numerous publications and degrees as evidence of her qualifications, those factors were irrelevant to Gates' termination decision. She was terminated by Gates for poor performance and for failure to meet her employer's job expectations. Plaintiff has introduced no meaningful evidence, other than her own conclusory affidavit, that she has met her job expectations or performed the job satisfactorily. Plaintiff's own subjective opinions regarding her job performance are not sufficient to carry the burden of proof. "It is the manager's perception of plaintiff's performance that is relevant in determining whether the proffered reason for adverse employment action [is unlawful.]" *Furr v. Seagate Technology, Inc.,* 82 F.3d 980, 988 (10th Cir.1996), cert. denied —— U.S. ——, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997)(ADEA case); *Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 747 (10th Cir.1991); *Branson v. Price River Coal. Co.,* 853 F.2d 768, 772 (10th Cir.1988).

Plaintiff has argued that she was treated different from other employees of Gates. However, she fails to demonstrate that her job responsibilities were comparable to those of the others to whom she compares herself, such as Doug Schneider, Cathy Johnson, David Hudgins and Steve Leatherland. There is no evidence in the voluminous record before this Court to demonstrate any such correspondence between plaintiff and these others and the Court is unable to find these individuals were similarly situated.

Even if this Court were to agree that plaintiff has presented a prima facie case, she has failed to rebut the defendant's legitimate business justifications for its actions. The reason offered by Gates for its action is plaintiff's poor job performance. The record is replete with evidence supporting this conclusion.

In September of 1996, a review regarding "Performance Planning and Development," was prepared by David Hudgins. This document provides:

Specific Performance Objectives for Next 6–12 Months:

1. To be proficient in the interpretation of infrared spectra generated in the FTIR laboratory by December 15, 1996.

2. To generate clear and concise analytical reports, without the need for review, to the client and department personnel by December 15, 1996.

3. To demonstrate competency in all the standard analytical operating procedures by August 1, 1997. **Several SOP have not been signed off. See Supplemental sheet.**

4. To increase computer literacy and general operation of the laboratory by demonstrating competencies relating to LIMS operation and general laboratory administration by March 15, 1997. **Zora lacks general computer handling skills with keeping proper maintenance of the FTIR files. I know of two recent situations where she formatted the hard drive incorrectly and where she configured it such that she thought the microscope was broke [sic].**

5. Demonstrate competency in chemical laboratory safety by December 15, 1996.

6. Increase Operation/understanding of the FTIR and dispersive infrared instruments by August 1, 1997.

7. Demonstrate improved communication and team work, on a routine basis, with peers within the laboratory by March 15, 1997. **Zora continues to work in her own world. She does not mark-off items on the "White Board" when complete. Most of time results are not available by the due date.**

DEVELOPMENTAL NEEDS

1. Increased interpretational skills.

2. increased technical writing skills. **Language use is still a barrier.**

3. Proficiency in documented FTIR laboratory analytical procedures.

4. Proficiency in documented LIMS and general laboratory administration operating procedures.

5. Proficiency in laboratory safety.

6. Improved skills in instrument maintenance and trouble-shooting operation problems for the FTIR and dispersive infrared instruments. **Too often the FTIR is broken when Zora attempts maintenance.**

7. Improved intra-laboratory communication/team-work. **Communication with the team is poor and abrupt. Zora does not open E-mail in a timely manner.**

DEVELOPMENTAL EXPERIENCES TO MEET NEEDS

1a. Complete ACS class Interpretation of Infrared Spectra.

2a. Complete ACS class Technical Writing.

3a. Review analytic SOPs with the Technical Lead and receive sign-off for each procedure listed on attached sheet. See supplemental sheet.

4a. Review LIMS and general laboratory SOPs with Technical Lead and/or QAU and receive sign-off for each procedure listed on attached sheet. See supplemental sheet.

Plaintiff's Memorandum, Exhibit H.

Plaintiff's Exhibit C is another document regarding "Performance Planning and Development" for plaintiff, prepared by Steve Leatherland for Doug Schneider, dated December 23, 1996. It again sets out specific performance objectives for the next six to twelve months:

1. To be proficient in the interpretation of infrared spectra generated in the FTIR laboratory by December 15, 1996. **Zora still has difficulty with the interpretation of IR spectra. Some improvements have been made, but I believe this is due to her becoming more proficient with the software as opposed to general knowledge of IR spectroscopy.**

2. To generate clear and concise analytical reports, without the need for review, to the client and department personnel by December 15, 1996. **Reports written by Zora tend to be difficult to read, this is due to her poor use of English. Words are often used in the wrong context and sentences are incomplete or the words are in the wrong order. Her use of the PC would appear to be below standard.**

3. To demonstrate competency in all the standard analytical operating procedures by August 1, 1997. **Some of her spectra are still below the standard required, this has on occasion led to her misinterpreting the data. She has recently begun to prepare more of her own samples, this has provided me with the opportunity to see how she operates in the chemistry lab environment, it is my opinion that she operates at a level that is characteristic of a technician and not a chemist. Pyrolysis of rubber samples is awkward and may explain the appearance of the spectra being generated—I have offered assistance in this area on several occasions but to date it has not been accepted. She still does not appear to understand the way the lab operates on a general basis. Due to her tardiness large numbers of samples are still on the shelves which causes sample tracking headaches. She Xerox copies everything, often one sheet at a time—one sample at a time, which consumes large amounts of time. If she operates the FTIR in the same way then this would explain why she cannot schedule her work efficiently.**

4. To increase computer literacy and general operation of the laboratory by demonstrating competencies relating to the LIMS operation and general laboratory administration by March 15, 1997. **Zora would benefit from taking some computer classes, especially those that would improve the appearance of her reports. Data entry into the LIMS is often late and on occasion still incomplete or incorrect. Zora is not capable of scheduling and prioritizing her workload, this results in poor CTI, large sample backlogs, late reports, and the increased frustration of her peers. This has on occasion caused the CTI of other chemists to be unduly increased and incomplete reports to be issued.**

5. Demonstrate competency in chemical laboratory safety by December 15, 1996. **Zora has attended the department safety video sessions and expressed a desire to view those that she has missed.**

6. Increase Operation/understanding of the FTIR and dispersive infrared instruments by August 15, 1997. **The recent problems with the microscope and data base files would suggest that Zora has not fully developed her operational and troubleshooting skills. The dispersive IR is still non-operational, requests to follow-up on the requisition for the service technician have gone unanswered. Zora has on occasion used the wrong technique and in so doing has produced sub-standard spectra or had to run the analysis again at my request.**

7. Demonstrate improved communication and team work, on a routine basis, with peers within the laboratory by March 15, 1997. **Zora has made no attempt to improve her team work or communication skills, she is quick however, to recommend that we all communicate better whenever we have a meeting to discuss any problems we have. From my experiences within the last few months it would appear that Zora evades issues, and misunderstands them to her own advantage. She still does not use the sample board to its fullest extent.**

## DEVELOPMENTAL NEEDS

1. Increased infrared interpretational skills

2. Increased technical writing skills.

3. Proficiency in documented FTIR laboratory analytical procedures.

4. Proficiency in documented LIMS and general laboratory administration operating procedures.

5. Proficiency in laboratory safety.

6. Improved skills in instrument maintenance and trouble-shooting operation problems for the FTIR and dispersive infrared instruments.

7. Improved intra-laboratory communication/team-work.

## DEVELOPMENTAL EXPERIENCES TO MEET NEEDS

1a. Complete ACS class "interpretation of Infrared Spectra". Minor improvements have been noted, but still a long way to go.

2a. Complete ACS class "Technical Writing". **Not reflected in her report writing to date.**

3a. Review analytical SOPs with Technical Lead and receive sign-off for each procedure listed on attached sheet. **Not done to my knowledge nor requested by her to date.**

4a. Review LIMS and general laboratory SOPs with Technical Lead and/or QAU and receive sign-off for reach procedure listed on attached sheet.

5a. Review SOPs and receive sign-off from the Technical Lead and/or QAU for each safety procedure listed on attached sheet. **Not requested to date.**

5b. Make-up missed safety videos sessions titled:

 a. OSHA—Lab Standard

 b. Hazard Alert—Lab Spills

 c. MSDS

 d. Handling Compressed Gas Cylinders

**Zora "demanded" that I make these videos available, she is quite capable of obtaining them from the TIC.**

5c. Attend all remaining safety videos or make-up sessions. **Done.**

·6a. Work with instrument service technician for increased training in maintaining and trouble shooting infrared instrumentation.

6b. Work with Technical Lead on a regular basis for information/expertise in maintaining and trouble shooting infrared instrumentation. **Not requested to date.**

7a. Diligently attend to her responsibilities on the schedule board and work with others in the lab to account for paperwork and samples. **Not done to date.**

TARGET COMPLETION DATE

1a. November 15, 1996

Plaintiff's Memorandum, Exhibit C.

Plaintiff's supervisor, Doug Schneider, stated the following concerns in his deposition:

A. I would have to say, no, in that I can understand her English very well. The written reports, however, I would agree with. But not necessarily because of perhaps English or whatever, but I would disagree—I would agree, I'm sorry, that the reports are confusing.

Q. Explain if it is not the English, or whatever I think you said.

A. The written reports that I'm familiar with would have had to do with analysis results and oftentimes would not be organized in an appropriate manner and would oftentimes make it difficult to understand what the objectives necessarily were. That's probably the biggest thing that come to mind at least.

Q. Anything else that come to mind that, maybe not the biggest, but other things that come to mind about her reports?

A. Her reports specifically?

Q. Yes, anything she authored, whether a report or letter, that kind of thing?

A. I would say that oftentimes conclusions were drawn on less than substantiated fact, as far as I was concerned, and others as well. It was—sometimes too much information was included. I would say those were the additional items, I would think.

Q. Could you explain further what you mean by sometimes too much information would be included?

A. Our reports oftentimes go out to nonchemists, most times go out to nonchemists. By just stating, for instance, peak positions and intensities and spectra that are generated from the instrument, that oftentimes doesn't tell someone not familiar with those kinds of things exactly what is going on. That, along, with not clearly stating results, oftentimes was confusing.

 \* \* \* \* \* \*

Q. Anything else?

A. And then basically followed it with the termination.

Q. When did you decide to terminate Dr. TOTH?

A. I would say when I wrote the final report.

Q. While you were writing it, or before you wrote it?

A. I believe it came about when I wrote the report finally.

Q. Why did you terminate her?

A. For lack of performance, principally.

Q. Could you be more descriptive please?

A. It was the—she had spent the better part of a year unable to reach a point where she could handle the workload, as evidenced by the large number of extremely overdue or overdue, past due, sample requests. And it was just obvious that we weren't going to be able to get on top of it.

\* \* \* \* \* \*

Q. Can you rate her on those as we sit here today? Can you tell me how she performed relative to each of those. Maybe you might want to read off the first one and tell us how she did, in your estimation?

A. Let's see. Providing detailed analysis of test materials in accordance with laboratory standard operating procedures.

I would say based on the performance I would say that's probably, she wouldn't rate very highly on that. That would get involved with the actual analysis.

As I have stated before, an awful lot of the work, spectral information was sub-par, conclusions, reports, would go along in there as well, so sub-par.

Q. How would you rate her over all on that category?

A. Well, overall, I would probably rate her below standard, which is one of the categories. Identification and development of innovative and cost effective test methods and lab processes as required.

I probably stated this on some of her actual job or performance reviews. Zora didn't document any new or different test methods while she was with us.

Q. So how would you rate her on that?

A. She would be below standard.

Q. Okay.

A. Applying academic knowledge to solve production and development problems. This is something that probably doesn't apply to her particular position, so it would be awfully difficult. She wouldn't have been involved in solving production and development problems directly.

Q. We will assume it doesn't apply then, and we won't ask you to rate her on that.

A. Working on a wide range of problems where causal relationships are difficult to establish, precedents are scarce, and the use of imaginative thinking is required.

Here again that does not directly apply. It probably applies more to different areas, different individuals.

Q. Okay.

A. Directing, supervising, and reviewing the work of subordinates. She didn't have subordinates, so that didn't apply. Scheduling test work and assigning tasks to subordinates. She didn't have a subordinate, so she wouldn't have done that. However, she would have scheduled test work. She had a work list that was easily accessible at any time, so she knew what samples had come in and when they were due.

And that was one of the problems I felt, was her lack of efficiency in scheduling. And I would say if I were rating her scheduling I would probably say that because of the preponderance of past due, extremely long overdue samples from time to time, that the scheduling would probably be rated below standard as well. And reporting test results to clients, that would be related below standard simply because she had yet to reach the point where we could do that without a review of her work. So I would say that would be below standard as well.

Q. Any other areas where would rate her, or are those all of them?

A. No, I would say because of comments that were made and her lack of team effort, I would rate her below on teamwork. I would rate her below probably on operation of the instrument, although there were times, at least at certain times, she did an acceptable job.

Defendant's memorandum, Exhibit G (Schneider deposition excerpts).

Defendant's Exhibit I, a performance evaluation for plaintiff dated August 15, 1996, is consistent:

Zora has been delinquent in providing analytical results to her clients many times the last several months. Sample workload has not been excessive. Her analytical delays have also caused internal friction where other analytical areas depend on her input. Zora appears to have trouble effectively operating the FTIR instrument, many times presenting sample spectra that are very noisy or of incorrect intensity. She is new to the daily operation of scientific instrumentation, and having difficulty with the parameters that come into play in sample preparation, instrument setup, and data collection. She continues to incorrectly interpret FTIR spectra, often basing her conclusions on very little substantial information. Her incorrect use of the search criteria and spectral libraries available, strained our credibility with at least one client.

Zora has been asked to issue her analysis reports to the Technical Lead for approval before issuing to the client. Her reports are sometimes confusing and often, incorrect conclusions are presented.

Although she has made improvements in her data entry in the LIMS system, she continues to input incorrect information into the system. Background information is sometimes entered instead of the results of the test. The correct input into the LIMS is very important in our quality system record keeping.

The mean cycle time for June was 19 days (target cycle time is 10 days) with 40 samples for the month recorded. The mean CTI for June was 187 (target is 100), or approximately twice as long as expected to provide client results. The average backlog sample in June was 21 days old, with a maximum age of 52 days.

Zora has tried to improve completing items on the white schedule board over the last two weeks, but seems to have her own priorities which causes some samples to be forgotten. Her CTI values the last two months demonstrate that technical questions and inquiries have not been answered within the agreed upon time with the client. The inaccuracies, and sometimes confusing analytical reports, do not clearly provide the client useful information. Zora seems to disregard assistance from the Technical Lead, content to operate in any manner she feel appropriate.

Zora attended a workshop last September entitled "analytical FTIR and Raman Spectroscopy for Industrial and Environmental Applications."

A loss of efficiency was observed in our reporting process when, in order to provide quality reports to the client, an added step for review was necessary.

Zora's lack of utilizing immediate help within the laboratory has caused extra work and no doubt delays, in getting the work accomplished.

Summary Comments: ... Zora can be a good communicator. Unfortunately, she also has the ability to be very demeaning to her coworkers, as well. Routine work, generally accepted by other chemists, is often deferred to other lab personnel. Her skill level in most required areas is well below where she needs to be to adequately perform her job. She should concentrate in improving her skills in 1) her organization of work, 2) infrared interpretation, 3) the operation/understanding of the FTIR instrumentation, 4) technical report writing, 5) LIMS housekeeping, and 6) team participation.

Zora does not get the job done satisfactorily. She is categorized as being in training because her job has changed from the time of last review. Her job description has been updated with Compensation. Because the analytical function is very necessary to the overall output of the laboratory, Zora's performance will be reviewed at the end of the calendar year.

Plaintiff's handwritten notation on this evaluation states:

This evaluation is *not* a realistic evaluation. It does not reflect the actual performance and my true value as research chemist. I request an independent FTIR expert to evaluate the situation in this matter.

Plaintiff's performance was reviewed again twice in January of 1997. The January 25, 1997 review states:

[as to analytical services] No change in attitude or performance since the last review. Zora continues to be below standard in scheduling and completing analysis.

[development of innovative applications of technology] No change in performance. Zora has not developed any new applications of technology while in our department.

[development of professional skills to meet stakeholders' expectations] No change in performance. No progress on PP & D objectives were reported. Still refuses the experience of the Technical Lead in Analysis and instrument operation.

[customer/client/associate satisfaction and communication with stakeholders] No change in performance from the last review. Still large number of overdue samples (65 samples currently back due on worklist). Still ignoring E-mail communications. Recently challanged [sic] Technical Lead with accusations of switching samples, even though witness corroborates Technical Lead's account.

[continuous improvement] No change in performance from her last review. No increase in productivity or timeliness of information is noted.

Summary comments: As I discussed with you in our last meeting, I am quite disappointed in your lack of progress toward bringing your performance up to a standard level. Your backlog continues to show a significant amount of delinquent samples and your explanation was that I was the reason you were so far behind. When I repeatedly asked you what for examples or specifics where I was the cause of your substandard performance, your response was "you know what I mean". I cannot respond to such a general statement without specific information. To the best of my knowledge, I have been responsive to all of your requests and supportive of your training needs as outlined in your PP & D.

Unless you demonstrate significant improvement by February 28th toward improving your overall performance or pro-

vide a reasonable explanation for your failure to do so, [end of page 2]

[page 3] Again, unless you demonstrate significant improvement by February 28th toward improving your overall performance, you may be subject to termination at that time or encouraged to look for other job opportunities for the duration of your probationary period.

We will meet again to review your performance February 19th. I will schedule the meeting time and place and notify you.

Plaintiff's performance was reviewed again February 5, 1997, approximately two weeks later. In general plaintiff's performance remained unchanged, although the review indicates she had made some progress in certain areas. This review also states:

Although you have made some improvements in your Past Due work, aided by a decreased number of new samples, your backlog continues to show a significant amount of delinquent work. You failed to provide me with a list of delinquent work, prioritization, and schedule of completion times requested in the last performance review on January 21st. Even though you were reminded in an E-Mail the following day. To the best of my knowledge, I have been responsive to all of your requests and supportive of your training needs as outlined in your PP & D.

Again, unless you demonstrate significant improvement by February 28th toward improving your overall performance you may be subject to termination at that time or encouraged to look for other job opportunities for the duration of your probationary period.

Plaintiff received another review March 14, 1997 from Schneider. In numerous areas, the review indicates that plaintiff performed below standard and that there had been no change in performance. In addition to backlog problems, the review includes the following comments:

The applicability and usability and the presentation of the information reported does not represent high professional standards and based on past history of overdue work, cannot meet the needs of the client. Zora's analysis reports most often contain

infrared spectra of very poor quality. Based on the collection of extra information usually included in her reports, she is not sure what infrared sampling technique is required for a given analysis. This overabundance of useless information is not explained, but usually left to confuse the client. Her reports continue to draw incorrect conclusions based on limited or poor information. The client expects 10 days as a normal cycle time for infrared analysis. While she does some work very quickly, a view of the attached sheet demonstrates her lack of desire to satisfy the client. Completion times, for the samples completed, ranged from 25 days to 134 days.

Summary Comments:

After more than a year in laboratory, working only in infrared (FTIR), Zora continues to exhibit difficulty in:

1) prioritizing work
2) choosing the correct analysis technique
3) correctly operating/aligning the instrumentation
4) understanding computer operation of the instrument
5) generating standard spectra
6) interpreting information
7) issuing written reports

Zora has been directed to the technical lead and myself on numerous occasions to assist her. She has not chosen to do so. After more than a year in this position, Zora should have been proficient in all of the above. I would consider the learning curve for a new chemist coming into the area to be no more than six months.

Although Zora has made some improvements in Past Due work, aided by a decreased number of new sample requests, her backlog continues to show a significant amount of delinquent work. It was agreed that Zora would seek help from either myself or the technical lead in setting up the correct method of analyzing each sample, in an attempt to increase her efficiency in the laboratory.

Zora was reminded that she needs to demonstrate significant improvement by March 18th toward improving her overall performance, or she will be subject to termination at that time.

The final evaluation in the record, dated March 26, 1997 states:

[analytical services] Zora has made some progress, aided with fewer than normal new requests being added to her work list, in her previous review (3/14/97). Although new analysis requests have been high the last several weeks, she has not been able to keep up with the pace. She now has 90 samples on her work list, 78 of which are past due (86.7%). A review of the bench sheet indicates even with the increased demands she does not seem to finish many sample requests a day. She often repeats or duplicates previous sample runs, which take time that could be used for new samples. She agreed in her last review to ask for help from either myself or the technical lead in setting up the analyses for samples before wasting time in trial and error. She has not asked either myself or the technical lead for assistance. Other performance aspects of her job function remain unchanged from previous reviews. Her reports still must be reviewed before sending to the client.

[developing innovative applications of technology] No change in performance. Zora has not developed any new techniques in this report period.

[developing professional skills so that all stakeholders' expectations are met] No change in performance. No progress on PP & D objectives were reported.

[customer/client/associate satisfaction and communication with stakeholders] Large numbers of overdue samples have developed again (78 samples currently back due on work list).

[continuous improvement] No change in performance from the last review. Still large number of overdue samples (78 samples currently back due on work list). Still largely ignoring E–Mail communications. Summary Comments: During this final two-week period of your probation, you have not demonstrated sustained improvement in the six areas you were rated Below Standard. As we have discussed from the beginning of your 90 day probationary period, failure to do so would result in termination.

Based on your failure to bring your standards to an acceptable level of performance, your employment with Gates is terminated effective March 28, 1997.

▇▇▇ To rebut this evidence evaluating her job performance and job deficiencies, plaintiff offers her own subjective belief, as embodied in her extensive affidavit, and the statement of Steve Leatherland that he knew of no reason for terminating plaintiff as a Gates employee. Plaintiff's opinions regarding her job performance are not the opinions that matter. The opinions that matter are those of the employer and the decision maker. *Furr v. Seagate Technology, Inc.*, 82 F.3d 980, 988 (10th Cir.1996)(ADEA case); *Fallis v. Kerr–McGee Corp.*, 944 F.2d 743, 747 (10th Cir.1991); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988). Further, the employer's articulated legitimate business reason does not become pretextual even if it turns out to be, in hindsight, an exercise of bad business judgment. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir.1998). The test is the employer's good faith belief. *Id.* at 1129. The Court finds that plaintiff's offered evidence in this regard fails to rebut the defendant's legitimate business justification for its employment decision regarding her employment at Gates and that the evidence offered by plaintiff does not remotely suggest that the employer's offered reasons were pretextual or unworthy of credence.

## C. Hostile work environment and discrimination on the basis of national origin

▇▇▇ In this case, plaintiff has also alleged that the violations of Title VII, particularly discrimination against her on the basis of national origin, also worked to create a hostile work environment. To prevail and survive summary judgment, the plaintiff must show that "under the totality of circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Trujillo v. University of Colorado Health Sciences Center*, 157 F.3d 1211 (10th Cir.1998), quoting *Bolden v. PRC, Inc.*, 43 F.3d 545, 552 (10th Cir.1994), in turn citing *Meritor Sav. Bank v. Vinson*, 477 U.S.

57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In evaluating the first prong of a hostile work environment claim, the Court must look at all circumstances, "including 'the frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, at 1214. Further, "a few isolated incidents of racial enmity are insufficient to survive summary judgment." *Id.*

▇▇▇ In this case, plaintiff's complaints in this regard fall short of the mark. The allegations asserted by plaintiff relating to discrimination on the basis of her national origin include that (1) she was unduly criticized by her supervisor about her use of English in her technical report writing, (2) a memorandum from Mr. Hudgins complaining to plaintiff's supervisor about plaintiff's writing skills and claiming that language was a barrier, (3) a comment made to her by a co-worker "to the effect that maybe something wasn't important in the country where she came from but it was important here," and (4) a claim that she was told by an unnamed engineer-project manager that it was a man's world and they did not want her European experience around here.

▇▇▇ The Court finds these allegations are not sufficient to survive summary judgment on plaintiff's hostile work environment claim. The comments are not pervasive or severe enough to alter the terms, conditions or privileges of plaintiff's employment and do not clearly appear to stem from racial animus. The deposition testimony of Schneider reflects that he had legitimate concerns about plaintiff's technical report writing as she often included in her reports irrelevant data, the reports were poorly organized and she had problems with syntax that detracted from the clarity of the reports she prepared. These concerns do not square with plaintiff's claims of animus against her in the work environment on the basis of national origin. Additionally, more than a few isolated incidents of enmity on the basis of national origin or race must be shown; sporadic comments are not sufficient. See e.g., *Witt v. Roadway Express*, 136 F.3d 1424, (10th Cir.

1998)(42 U.S.C. § 1981 claim). Plaintiff is unable to identify the speaker of the "European experience" comment; the remainder of comments were not made by superiors and appear to have been isolated comments which cannot be viewed as capable of altering the terms, conditions and privileges of plaintiff's employment at Gates. Accordingly, summary judgment as to plaintiff's hostile work environment claim will be granted.

## D. Age discrimination

■ Under the ADEA, in order to establish a prima facie case of discrimination on the basis of age, of an employee must show:

> ... that he or she was 40 years of age or older, that he or she was doing satisfactory work, that he or she was discharged despite the adequacy of his or her work, and that his or her position was filled by a younger employee. *Brown v. Denver Symphony Ass'n,* 794 P.2d 1011 (Colo.App. 1989). To establish a claim for willful discrimination, the jury must additionally find that the employer either knew or showed reckless disregard for whether its conduct was prohibited by the ADEA.

The employer may rebut this prima facie proof if it produces evidence that the plaintiff was fired for a legitimate nondiscriminatory reason. However, the plaintiff may still prevail if the employer's ostensible reason is actually a pretext for discrimination. *Brown v. Denver Symphony Ass'n,* supra.

Although some federal courts have used the "predominant factor" test, which requires an employee to demonstrate that age was a predominant factor in an employer's discharge decision, see *Cooper v. Asplundh Tree Expert Co.,* 836 F.2d 1544 (10th Cir.1988), the United States Supreme Court rejected this test for proving a willful ADEA violation earlier this year. See *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). In doing so, the court reaffirmed its holding in *Trans World Airlines v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).

The Supreme Court's unanimous opinion in *Hazen,* supra, 507 U.S. at 615–16, 113 S.Ct. at 1709–10, 123 L.Ed.2d at 351, states:

> We therefore reaffirm that the Thurston definition of willful—that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute—applies to all disparate treatment cases under ADEA. Once a willful violation has been shown, the employer need not additionally demonstrate that the employer's conduct was outrageous, or prove direct evidence of the employer's motivation, or prove that age was a predominant rather than a determinative factor in the employment decision. (emphasis added).

*Evenson v. Colorado Farm Bureau Mutual Ins. Co.,* 879 P.2d 402, 405 (Colo.App.1993), cert. den.1994.

The Tenth Circuit has reaffirmed its use of the *McDonnell Douglas* scheme for analyzing ADEA claims when no direct evidence of discrimination exists.

> At the first stage, the plaintiff must prove a prima facie case of discrimination, i.e., that (1) he is "within the protected age group;" (2) he "was doing satisfactory work," (3) he "was discharged;" and (4) his position was filled by a younger person. *Cone v. Longmont United Hospital,* 14 F.3d 526, 528–30 (10th Cir.1994). In the second stage, the defendant must carry the burden to provide a legitimate nondiscriminatory reason for plaintiff's termination. *Id.* If defendant articulates a legitimate, nondiscriminatory reason for its action, the burden of production shifts back to the plaintiff, who as plaintiff must also carry the burden of persuasion. In the third stage, plaintiff must show that age was a determinative factor in defendant's employment decision, or show that the defendant's explanation was merely a pretext. *Id.; Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1425 (10th Cir.1993).

*McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1128 (10th Cir.1998).

Further:

> Pretext in cases such as this may be established by showing either "that a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of cre-

dence." *Rea v. Martin Marietta Corp.,* 29 F.3d 1450, 1455 (10th Cir.1994) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Where as here plaintiff seeks to demonstrate that the employer's explanation is merely a pretext, this court "requires a showing that the tendered reason for the employment decision was not the genuine motivating reason, but rather was a disingenuous or sham reason." *Reynolds v. School District No. 1 Denver,* 69 F.3d 1523, 1535 (10th Cir.1995). Summary judgment is not ordinarily appropriate for settling issues of intent or motivation.... However, in this case, McKnight has not shown that at the time of his termination there was any dispute or a genuine issue concerning the sincerity of defendants' proffered reason for his termination. In this case the totality of McKnight's proffered evidence is insufficient to raise a genuine doubt about KCC's motivation at the time of termination. An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment. *Reynolds,* 69 F.3d at 1535. The test is good faith belief. *Id.* In this regard, if KCC believed Patton's allegations and terminated McKnight for that reason, such belief would not be pretextual even if the belief was later found to be erroneous. Based upon the foregoing, this court finds no evidence in this record that KCC's stated reason at the time of termination of McKnight was pretextual.

*McKnight v. Kimberly Clark Corp.,* 149 F.3d at 1129 (some citations omitted). See also *Beaird v. Seagate Technology, Inc.,* 145 F.3d 1159 (10th Cir.1998) (reduction in force case; also involves claims of racial and gender discrimination in violation of Title VII—all to be assessed under the same McDonnell Douglas order of proof); *Baucom v. Amtech Systems Corp.,* 131 F.3d 151 (Table), Unpublished Disposition, Text at 1997 WL 748668 (10th Cir.1997).

 In this case, the Court finds that there is no evidence of ageist discrimination whatsoever to sustain plaintiff's claims in this regard, with the single exception of the selection of Mr. Larmi for the Air Springs De-

partment position. As to this exception, the defendant has articulated a legitimate, nondiscriminatory business reason for its selection of Mr. Larmi for that position. Plaintiff admits she has no knowledge regarding his actual experience, background and qualifications and simply speculates that she is more qualified for the position. The plaintiff's self-serving conjecture and speculation do not serve to demonstrate that the employer's proffered reasons for the challenged actions are pretextual and unworthy of belief. Accordingly, the Court finds the plaintiff has failed to sustain her ADEA claim.

### E. Failure to promote theory

 The elements of a prima facie case as set forth in *McDonnell Douglas* will also be applied to promotion cases. In failure to promote cases, to establish a prima facie case, a plaintiff must "show that there were promotional opportunities available that were filled by males, that she was qualified to promotion, and despite her qualifications she was not promoted." *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355 (10th Cir. 1997), citing *Nulf v. International Paper Co.,* 656 F.2d 553, 557 (10th Cir.1981). The ultimate burden of establishing intentional discrimination remains with the plaintiff.

The evidence before the Court demonstrates that another was selected for the Air Springs position for legitimate business reasons, which have not been refuted by plaintiff. Larmi was selected for the position because he was seen as the more qualified job candidate. The affidavit of Mike Crabtree, the Manager of Product Development— Air Springs Group states the following:

2. During 1995, Zora Toth was assigned, on a temporary basis, to Air Springs to solve an adhesion problem relative to a particular Air Springs product. Ms. Toth had been assigned to the Group because of her technical adhesive and bonding experience. Ms. Toth's work relative to the adhesion problem ultimately proved to be of little or no value to Air Springs, because in the end she was unable to develop a solution to the adhesion problem.

3. In addition, Ms. Toth had difficulty getting along with other members in Air Springs, which was inconsistent with the "team player" atmosphere which exists within the Group.

4. In January of 1997, Bob Arterburn, Materials Manager and Quality Manager for the Air Springs Group, retired. At the time of Mr. Arterburn's departure, a joint decision was made by myself and Steve Obrand, General manager—Air Springs Division for Gates, to separate the materials and quality functions, which had been performed by Mr. Arterburn into two separate positions. This decision was based on the fact that the focus of Air Springs had evolved from a research and development function to a product production function, which in turn mandated a full time materials position.

5. On January 16, 1997, I made a requisition for a Materials Development Engineer position. On January 17, 1997, this position was posted for internal applications from existing Gates employees. The primary functions of the Materials Development Engineer position include:

 a. Reviewing lab test results;

 b. Development of new materials for use in Air Springs product production; and

 c. Working and coordinating with suppliers to develop new materials for use in Air Springs product production.

The time commitment for each of the three functions is broken up on average 25%, 25% and 50%, respectively.

6. I received applications for the Materials Development Engineer position from Ms. Toth and Rich Larmi, both of whom were interviewed for the position. Based upon my interviews, I was able to determine that both Ms. Toth and Mr. Larmi had the technical experience for the position. Moreover, I was able to determine that Mr. Larmi had, as compared to Ms. Toth, from his prior experiences at Gates, acquired significant experience in the area of working with product production and interaction with material suppliers. Finally, I determined that Mr. Larmi was more interpersonal in nature as compared to Ms. Toth and therefore would meld into the team player approach utilized by the Air Springs Group. Such interpersonal skills are essential to the smooth functioning of Air Springs. Based upon my respective interviews of Ms. Toth and Mr. Larmi, I made the decision that Mr. Larmi was the most overall qualified individual for the Materials Development Engineer position.

Defendant's memorandum, Exhibit H.

Plaintiff admits she does not know what Larmi's qualifications for the job were and stated that she believed she was the best qualified person for the job. "In order to survive summary judgment, there must be some evidence, distinct from the plaintiff's own assertions, that a factual issue exists." *Allen v. Denver Public School Board*, 928 F.2d 978, 985 (10th Cir.1991). In the absence of such other evidence, the plaintiff's claim on this basis fails.

The Court agrees with defendant that any claims asserted by plaintiff for a failure to promote based upon promotions she claims she did not receive in very early 1995 and earlier are barred for not having been filed within the 300 day period for filing EEOC charges. Plaintiff has attempted to assert that a continuing violation has occurred which would permit claims outside of the limitations period to be pursued.

■ It appears to this Court that plaintiff's primary failure to promote claim is that arising out of the selection of Larmi for the Air spring Department position in 1997. To the extent that there are other claims for failure to promote, the Court finds they are barred. Plaintiff would have had notice of any such adverse employment decision—the decision not to promote plaintiff into other positions that she sought—in early 1995 or before. The 300 day filing period begins to run when the employee learns or is notified of the adverse employment decision. Plaintiff would have discovered that she would not be promoted in 1995.

■ Responding to the argument that a continuing violation occurred in this case which would require only one act of discrimination to fall within the 300 day time limit, the Court offers the following observations. Equitable tolling of the applicable limitations period is only appropriate where the circum-

stances of the case rise to the level of active deception by the defendant or where a plaintiff has been lulled into inaction by her employer, state or federal agencies or the courts. *Mosley v. Pena,* 100 F.3d 1515, 1518 (10th Cir.1996); *Hulsey v. Kmart, Inc.,* 43 F.3d 555, (10th Cir.1994); *Mascheroni v. Board of Regents of the University of California,* 28 F.3d 1554, 1562 (10th Cir.1994); *Martin v. Nannie and The Newborns, Inc.,* 3 F.3d 1410 (10th Cir.1993); *Purrington v. University of Utah,* 996 F.2d 1025, 1030 (10th Cir.1993). Active deception about the procedural prerequisites of Title VII requires something more than the false hope that problems may be resolved internally. *Mascheroni v. Board of Regents of the University of California,* 28 F.3d at 1563.

*Mascheroni* illustrates this principle. In that case, the plaintiff alleged that the defendant's human resources personnel encouraged him to exhaust all administrative processes and internal grievance mechanisms before filing a Title VII complaint and had pointed as well to supervisors' misrepresentations concerning efforts to revive the security clearance that had been withdrawn by the Department of Energy. The Tenth Circuit did not find these factors sufficient to invoke equitable tolling. It stated, in part:

> ... Dr. Mascheroni knew of the allegedly false and potentially discriminatory reasons for his initial RIF and allegations of his security breaches more than one year before he was dismissed. Comments by the security division leader and the human resources department may have given him false hope that his problems could be resolved internally, but they do not rise to the level of active deception about the procedures for filing a Title VII claim that we articulated in *Scheerer,* 950 F.2d at 665, and *Wilkerson v. Siegfried Insurance Agency,* 683 F.2d 344, 348 (10th Cir.1982) (the evidence must establish either active deception about the procedural prerequisites of Title VII or that the plaintiff "has in some extraordinary way been prevented from asserting his or her rights").... Merely alleging business reasons or a corporate culture that discouraged him from suing promptly does not state a basis for invoking the equitable tolling doctrine.

*Mascheroni v. Board of Regents of the University of California,* 28 F.3d at 1562–1563 (footnote omitted).

Timely filing is a prerequisite to an employment discrimination civil suit. *Webb v. Owens–Corning Fiberglass Corp.,* 141 F.3d 1187 (Table)(Unpublished Disposition), 1998 WL 163725, at *1 (10th Cir.1998). The plaintiff claims that acts of discrimination giving rise to her claims are decisions not to promote her in 1995. Plaintiff's EEOC charge was not filed until August 13, 1996. This filing was not timely, as it was not within 300 days after the alleged unlawful practice occurred. Furthermore, there is no factual basis for finding that the 300 day time limitation should be equitably tolled. There was no active deception by the defendant nor was plaintiff lulled into inaction by her employer, state or federal agencies or the courts. Thus, the Court concludes that plaintiff's failure to promote claims fails.

### F. Title VII retaliation

To prove a Title VII retaliation claim, a plaintiff must:

> ... first establish a prima facie case of retaliation. If a prima facie case is established, then the burden of production shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse action. If evidence of a legitimate reason is produced, the plaintiff may still prevail if she demonstrates the articulated reason was a mere pretext for discrimination. The overall burden of persuasion remains on the plaintiff.

*Adams v. City of Oklahoma City,* Unpublished Disposition, Text at 1998 WL 381062 (10th Cir.1998), quoting *Sorensen v. City of Aurora,* 984 F.2d 349, 353 (10th Cir.1993). See also *Trujillo v. University of Colorado Health Sciences Center,* 157 F.3d 1211, 1215–1217 (10th Cir.1998); *Roberts v. Roadway Express, Inc.,* 149 F.3d 1098, 1103–1105 (10th Cir.1998); *Morgan v. Hilti, Inc.,* 108 F.3d 1319 (10th Cir.1997).

The Tenth Circuit has also stated:

> To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate "(1) protected opposition to Title VII discrimination or participation in a

Title VII proceeding; (2) adverse action by the employer subsequent to or contemporaneous with such employee activity; and (3) a causal connection between such activity and the employer's adverse action." *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 985 (10th Cir.1996). "The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.,* 683 F.2d 339, 343 (10th Cir.), cert. denied, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982).

*Id.,* at 1998 WL 381062, *4.

The evidence presented to the Court in the parties' submissions, when considered as a whole, does not establish that plaintiff was terminated in retaliation for her internal complaints of employment discrimination to Gates' management or her EEOC complaint. Plaintiff's factual allegations in this regard are extremely vague. She has failed to demonstrate that the nondiscriminatory reason for her termination, failure to meet the employer's performance objectives, was a mere pretext for retaliation. With this failure, this Court is unable to find that plaintiff has raised any inference of pretext. Plaintiff's termination completed the process that was begun when her probationary period, a time within which she was allowed to try to meet her employer's performance objectives, expired without meeting those objectives.

■■■■■ Plaintiff has presented no evidence whatsoever to support her claim that her termination from Gates was related to her internal complaints of discrimination or connected to her EEOC charge. The Court has not ignored in its analysis the comment allegedly made by Schneider that plaintiff's EEO complaints had made his year miserable. This comment standing alone is somewhat ambiguous. Plaintiff has offered no evidence to suggest that her termination was unrelated to her unacceptable performance. Other than plaintiff's own very favorable self-evaluation of her work performance, she offers no evidence that suggests she had indeed met the terms of the purported agreement governing her probationary period. The statements of Leatherland that he knew of no reason to terminate plaintiff are of little assistance in this regard, as they might be considered, (and only if construed most favorably to plaintiff), mere general statements of disagreement with the decision-maker's evaluation of plaintiff's performance. "Under the law of this circuit, even if the jury chose to believe plaintiff's assessment of [her] performance rather than [Gates'], that choice, standing alone, does not permit a conclusion that [Gates'] version was a pretext for [unlawful] discrimination." *Fallis v. Kerr-McGee Corp.,* 944 F.2d 743, 747 (10th Cir.1991). Courts are not free to second guess an employer's business judgment and a plaintiff cannot prevail by challenging in general terms the accuracy of a performance evaluation which the employer relied on in making its employment decision. *Id.*

## G. Title VII disparate pay claim

■■■ In a claim asserting Title VII violations on the basis of disparate pay, a plaintiff establishes a prima facie case of sex discrimination by showing she occupies a job similar to that of higher paid males. Once a prima facie case is established, the employer must articulate legitimate, nondiscriminatory reason for the pay disparity.

"This burden is 'exceedingly light'; the defendant must merely proffer non-gender based reasons, not prove them." *Id.* [*Meeks,* 15 F.3d at 1019].... Once the defendant advances such a justification, the plaintiff must show that the defendant, regardless of the proffered reasons, intentionally discriminated against her... That is, "the plaintiff must show that 'a discriminatory reason more likely than not motivated [the employer] to pay her less.'"

...

*Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1363 (10th Cir.1997) (most citations omitted).

■■■ The plaintiff in this case has failed to present any genuine issues of material fact that would tend to support this type of Title VII discrimination claim. There is no evidence demonstrating any correspondence between plaintiff's job duties, qualifications and responsibilities and those of the persons to whom she had compared herself. The differences in pay between plaintiff and others

employed by Gates in different capacities is justifiable and consistent with different levels of importance, value, and depth of responsibility. *Sprague v. Thorn Americas, Inc.,* 129 F.3d at 1363. There are legitimate reasons for the differences in pay and none of the evidence presented by plaintiff reveals any desire by Gates to intentionally pay her less because of her gender. Accordingly, her Title VII discrimination claim so fails.

### H. Equal Pay Act claim

■ To establish a prima facie Equal Pay Act claim, pursuant to 29 U.S.C. § 206(d)(1),[1] a plaintiff must show:

(1) that she was performing work which substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) male employees were paid more under such circumstances. . . . "If a prima facie is so established under the EPA the defendant must undertake the burden of persuading the jury that there existed reasons for the wage disparity which are described in the [EPA]. . . If the defendant fails in this respect, the plaintiff will prevail on her prima facie case. . . Thus, under the EPA, 'the onus is on the employer to establish that the pay differential was premised on a factor other than sex. Under Title VII, however, the plaintiff must prove that the employer had discriminatory intent.' " . . .

*Sprague v. Thorn Americas, Inc.,* 129 F.3d at 1364 (citations omitted).

■ Upon a review of the parties' submissions, the Court concludes that plaintiff has failed to produce evidence that her job functions were substantially similar or substantially equal to those of the males to whom she has elected to compare herself.

Plaintiff did not demonstrate she occupied substantially the same position or performed substantially the same tasks, nor has she demonstrated that any pay differentials were not premised on factors other than sex. Accordingly, her EPA claim fails.

### 2. State Law Claims

### A. Express and implied contract claims

Under Colorado law, an employee hired for an indefinite period of time is an at-will employee, whose employment may be terminated by either party without cause and without notice, and whose termination does not give rise to a cause of action. *Continental Air Lines v. Keenan,* 731 P.2d 708, 711 (Colo.1987). An employer can be liable for the discharge of an at-will employee, however, where an implied contract arises out of company policy and employment manuals or where an employee relies on the policies and manuals to his detriment. See *id.* at 711–12.

Under an implied contract theory, a discharged employee must first show that in promulgating an employment manual or policy, the employer was making an offer to the employee—"that is, the employer manifested his willingness to enter into a bargain in such a way as to justify the employee in understanding that his assent to the bargain was invited by the employer and that the employee's assent would conclude the bargain." *Id.* Additionally, the employee must show that his initial or continued employment constituted acceptance of and consideration for those procedures. *Id.* at 711 (citation omitted).

An offer in the form of an employment manual must be communicated to the employee to be effective, and an employer's limited distribution of its employment

---

1. This section provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility,

and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, that an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

manual or policy indicates the employer did not intend the manual to operate as a contractual offer to the employee. See *Kuta v. Joint Dist. No. 50(J)*, 799 P.2d 379, 382 (Colo.1990) (employer's limited distribution of RIF policy "undercuts the assertion that it manifested a willingness to enter into a bargain"). An offer must also contain terms "sufficiently definite to enable the court to determine whether the contract has been performed." *Stice v. Peterson*, 144 Colo. 219, 223, 355 P.2d 948, 952 (1960). Finally, while the existence of an implied contract is normally a factual inquiry for the jury, see *Tuttle v. ANR Freight Sys., Inc.*, 797 P.2d 825, 828 (Colo. App.1990), the issue may be decided as a matter of law if the alleged promises are nothing more than "vague assurances." See *Dupree v. United Parcel Service*, 956 F.2d 219, 222 (10th Cir.1992).

*Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1464 (10th Cir.1994). See also *George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, (Colo.App.1997); *Evenson v. Colorado Farm Bureau Mut. Ins. Co.*, 879 P.2d 402, 409 (Colo.App.1993); *Adams County School Dist. No. 50 v. Dickey*, 791 P.2d 688, 693–694 (Colo.1990); *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711–712 (Colo.1987).

**B. Promissory estoppel**

In this case, the plaintiff has also asserted a promissory estoppel theory to support her claims against the defendant.

Under Colorado law, if a discharged employee fails to show the existence of an implied contract, the employee may nevertheless enforce the employment manual and procedures under a theory of promissory estoppel if he can demonstrate that (1) the employer should reasonably have expected the employee to consider the employee manual as a commitment from the employer to follow policies contained in the manual, (2) the employee reasonably relied on the termination procedures to his detriment, and (3) that injustice can be avoided only by enforcement of the termination procedures. *Keenan*, 731 P.2d at 712. In proving detrimental reliance, the employee must show action or forbearance taken as a result of the employer's alleged promises. See *Kiely v. St. Germain*, 670 P.2d 764, 767 (Colo.1983).

*Vasey v. Martin Marietta*, 29 F.3d at 1466. See also *Evenson v. Colorado Farm Bureau Mutual Ins. Co.*, 879 P.2d 402 (Colo.App. 1993), cert. den.1994.

**C. Discussion of state claims**

Under either of these theories, a plaintiff must make a showing of an offer of employment or a promise upon which the plaintiff could reasonably rely. *Backlund v. Gates Corp.*, 62 F.3d 1428,(Table), Unpublished Disposition, Text at 1995 WL 480328, *2 (10th Cir.1995). Plaintiff has not made this showing, and thus any claims based upon these theories must fail.

■ Defendant's policies and procedure, the employee handbook and the application of employment all clearly provide for an at-will employment relationship that can be terminated by either party at any time, with or without cause. The statements that plaintiff has relied upon made by Schneider did not constitute promises of indefinite employment and there is no evidence in the record to suggest that Schneider had authority to enter into any type of employment agreement, other than at-will employment, with plaintiff. Gates' statements of policy regarding its employees are just that—statements of policy. The statements are the "vague assurances" that are too indefinite to constitute a contractual offer. These statements do not constitute legally binding agreements to enter into a contract of employment and do not manifest a willingness to enter into a contractual relationship with its employees. Plaintiff has failed to produce any evidence from which a reasonable inference can be drawn to support her contract claims.

■ As to plaintiff's promissory estoppel theory, plaintiff's claim fails because she has not shown that she acted or forbore from acting as a result of any of defendant's employment policies. From the record that is before this Court, it appears that plaintiff was given numerous opportunities to improve her performance, and thus continue as a Gates employee, but that she failed to accomplish the goals that had been established by Schneider when she was placed on probation. There is no evidence of detrimental reliance

by plaintiff to support her promissory estoppel claim.

Because the foregoing determinations are dispositive of all of plaintiff's claims, the Court need not consider the arguments advanced by defendant with respect to the after-acquired evidence doctrine.

Accordingly, and for the foregoing reasons, it is therefore

**ORDERED** that defendant's Motion for Summary Judgment (as to all claims asserted against it by plaintiff) shall be, and is, **GRANTED.** It is further

**ORDERED** that judgment shall be entered in favor of Defendant Gates on all claims asserted against it by plaintiff, with defendant to recover its costs of this action and the parties to bear their own attorney's fees.

**JUDGMENT SHALL BE ENTERED ACCORDINGLY.**